JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, e[xcept as] provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court fo[r the] purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Medical Transcription Billing Corp.

**DEFENDANTS**
QHR Technologies, Inc.

(b) County of Residence of First Listed Plaintiff: Somerset
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant:
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, Email and Telephone Number)*
Melissa L. Paget, Litigation attorney o/b/o MTBC, 7 Clyde Road, Somerset, NJ 08873

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☒ |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**[V]I. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
Fraud, Indemnification

**[V]II. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**[V]II. RELATED CASE(S) IF ANY** *(See instructions)*:
JUDGE Hon. Stewart Dalzell
DOCKET NUMBER 15-05290-SD (E.D. Pa)

[DAT]E
[11/]18/2016
SIGNATURE OF ATTORNEY OF RECORD
[signature]

**[FOR] OFFICE USE ONLY**

[RE]CEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE

Melissa L. Paget
7 Clyde Road
Somerset, New Jersey 08873
732- 873- 3378
Atty ID: 023102010
*Attorney for Plaintiff*

**UNITED STATED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **MEDICAL TRANSCRIPTION BILLING, CORP.,** *Plaintiff,* vs. **QHR Technologies, Inc.** *Defendant.* | Civil Action No.: **COMPLAINT** |

Plaintiff, **Medical Transcription Billing, Corp.,** by way of Complaint against **QHR Technologies, Inc**, says:

**AS TO THE PARTIES**

1. Plaintiff, Medical Transcription Billing, Corp., ("Plaintiff" or "Company"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 7 Clyde Road, Somerset, New Jersey 08873.

2. Upon information and belief, Defendant QHR Technologies, Inc. ("QHR") is a corporation organized and existing under the laws of British Columbia, Canada with an address of 1620 Dickson Ave. Kelowna, BC V1Y 9X1, Canada.

## JURISDICTION AND VENUE

1. Jurisdiction is proper because Defendant, a Canadian Corporation, conducted business with Plaintiff, including meeting with Plaintiff at its office in Somerset, New Jersey, and is subject to the jurisdiction of this Court.

2. Plaintiff has sustained damages in excess of $75,000.

3. The Court is the proper venue for this action.

## AS TO ALL COUNTS

1. Plaintiff, MTBC is a publicly traded healthcare IT company which provides medical billing and practice management services to healthcare providers throughout the United States.

2. Defendant is a healthcare technology company.

3. In June 2015, MTBC was approached by QHR with an opportunity to purchase the assets of its United States subsidiary, SoftCare Solutions, Inc. (successor by merger to I-Plexus Solutions, Inc. and hereinafter referred to as "SoftCare").

4. SoftCare carried on clearinghouse, medical billing and Tradelink EDI businesses.

5. QHR was the parent company of SoftCare and participated in all negotiations of the purchase of SoftCare.

6. Upon information and belief, during the period from December 20, 2012 to July 10, 2015, SoftCare provided various services to Moore Eye Care, P.C. a Pennsylvania professional corporation which is in the business of providing medical and surgical services in the specialty of ophthalmology. *The SoftCare/Moore Eye Contract is annexed hereto as Exhibit "A".*

7. Moore Eye Care, P.C. was founded by Dr. Leonard Ginsburg, who is the sole shareholder.

8. During the negotiation of the sale of SoftCare to MTBC, QHR represented to MTBC that Moore Eye was indebted to its subsidiary, SoftCare, in the total sum of $338,177.36 for

services rendered under the SoftCare/Moore Eye Contract during the period through June 30, 2015 ("The Moore Eye Accounts Receivable").

9. The Moore Eye Accounts Receivable made up the majority of the account revenue MTBC was to assume through the purchase of its subsidiary, SoftCare.

10. During the negotiation of the sale of its subsidiary, QHR represented that The Moore Eye Accounts Receivable was valid and collectable.

11. On or about June 9, 2015, Michael Dingle, Senior Vice President of QHR, and Beth Hall, Corporate Development and Operations of QHR, conducted a telephone discussion with MTBC.

12. On or about June 9, 2015, QHR represented that its billing service was focused on ophthalmology.

13. On or about June 9, 2016, QHR represented that it had employees working the Moore Eye Account full time including the Moore Eye Accounts Receivable.

14. On or about June 16, 2015, Mr. Dingle of QHR, traveled to MTBC's office located in Somerset, New Jersey to discuss the sale of SoftCare and entering into an Asset Purchase Agreement ("Asset Purchase Agreement").

15. On or about June 16, 2015, Mr. Dingle represented to MTBC that the only reason for the delay in payment by Moore Eye on the accounts receivable was because Dr. Ginsburg expected to be treated differently from everyone else.

16. On or about June 16, 2015, Mr. Dingle represented to MTBC that Dr. Ginsburg received a mailed quarterly statement, which he ignored, until he was wined and dined, after which he paid his outstanding invoices.

17. On July 10, 2015, an Asset Purchase Agreement was entered into between MTBC and SoftCare Solutions, Inc., a company incorporated under the Laws of Nevada, having an office

c/o QHR Technologies Inc. (the "Asset Purchase Agreement").   *The Asset Purchase Agreement is annexed hereto as Exhibit "B".*

18. The Asset Purchase Agreement was signed on MTBC's behalf by its President, Stephen Snyder, and was signed on SoftCare c/o QHR's behalf by QHR's Vice President and Chief Financial Officer, Jerry Diener.

19. As part of the Asset Purchase Agreement, MTBC assumed the SoftCare/Moore Eye Contract, and SoftCare c/o QHR assigned to MTBC all sums due and owing by Moore Eye to SoftCare c/o QHR for the services rendered by SoftCare under the SoftCare/Moore Eye Contract. *A copy of the Assignment and Assumption Agreement is annexed as Exhibit "C".*

20. The Assignment and Assumption Agreement was signed on MTBC's behalf by its President, Stephen Snyder, and was signed on SoftCare c/o QHR's behalf by QHR's Vice President and Chief Financial Officer, Jerry Diener.

21. Pursuant to the Asset Purchase Agreement, dated July 10, 2015 SoftCare c/o QHR assigned to MTBC The Moore Eye Accounts Receivable due to SoftCare by Moore Eye.

22. SoftCare Solutions c/o QHR warranted and represented to MTBC under the Asset Purchase Agreement and otherwise that The Moore Eye Accounts Receivable was $260,097.24 as of April 30, 2015.

23. SoftCare c/o QHR warranted and represented to MTBC under the Asset Purchase Agreement and otherwise that The Moore Eye Accounts Receivable was $260,097.24 as of April 30, 2015 and that The Moore Eye Accounts Receivable constituted the valid obligation of Moore Eye to SoftCare.

24. SoftCare c/o QHR warranted and represented to MTBC under the Asset Purchase Agreement that the Accounts Receivable, notes receivable and other receivables of SoftCare were accurate and complete as of the date of the Asset Purchase Agreement.

25. SoftCare c/o QHR warranted and represented to MTBC under the Asset Purchase Agreement and otherwise that no current client indicated during the past twelve months, through written notice of breach or termination that SoftCare was in breach relative to any Agreement or, to SoftCare c/o QHR's knowledge, through oral or other type of communication.

26. Upon information and belief, Moore Eye is indebted to SoftCare in the total sum of $338,177.36 for services rendered by SoftCare under the SoftCare/Moore Eye Contract during the period through June 30, 2015.

27. During the period from July 10, 2015 through August 13, 2015, MTBC provided additional services to Moore Eye under the SoftCare/Moore Eye Contract.

28. Moore Eye is indebted to MTBC in the amount of $34,382.13 plus 3.42% of Moore Eye's collections during the period from August 1, 2015 through August 13, 2015 for services rendered by SoftCare and MTBC under the SoftCare/Moore Eye Contract during the period from July 1, 2015 through August 13, 2015.

29. On or about August 5, 2015, MTBC provided an invoice to Moore Eye for the month of July 2015, together with the carried forward Moore Eye Accounts Receivable balance. *A copy of the invoice is annexed hereto as Exhibit "D"*.

30. On or about August 6, 2016, Arthur Geary, on behalf of Moore Eye, advised that no payments had been made on this account with the full knowledge and agreement with the prior owners of QHR because of continuing issues for which MTBC was now responsible.

31. Notwithstanding MTBC's demand for payment, Moore Eye refused to pay MTBC for all or any portion of the amount owed by Moore Eye for services rendered by QHR's subsidiary, SoftCare, under the SoftCare/Moore Eye Contract because of the prior owner's representations and continuing issues.

32. Notwithstanding MTBC's demand for payment, Moore Eye refused to pay MTBC for all or any portion of the amount owed by Moore Eye for services rendered by MTBC during the period of July 1, 2015 through August 13, 2015.

33. After Moore Eye's refusal to pay for The Moore Eye Accounts Receivable or for any portion of services rendered by MTBC, MTBC informed Moore Eye that it was suspending its services.

34. In turn, Moore Eye has alleged, in its Complaint pending in the Eastern District of Pennsylvania, Civil Action No.: 15-CV-05290-SD and otherwise, that QHR agreed to write off the Moore Eye Receivable. *A copy of the Moore Eye Complaint is annexed hereto as Exhibit "E".*

35. Moore Eye has alleged damages against MTBC for breach of contract in excess of $100,000.

36. Moore Eye has asserted that in addition to waiving the Moore Eye Receivables prior to the Asset Purchase Agreement, QHR agreed to waive future receivables for an indefinite period of time.

37. QHR is no longer a party to Civil Action No.: 15-CV-05290-SD having settled with Moore Eye for an undisclosed amount.

## FIRST CAUSE OF ACTION

### Fraud

38. MTBC incorporates herein by reference the allegations contained in Paragraphs 1-37. above.

39. QHR Technologies made numerous representations to MTBC, or representatives of MTBC which were false, with the knowledge of their falsity and/or made recklessly as to whether they were true or false. Such claims included those set forth above, together with the following (a) that its relationship with Moore Eye was strong and free of controversy, (b) that

Moore Eye was satisfied with the quality of the billing services being provided by its subsidiary SoftCare, (c) that the Moore Eye accounts receivable that was sold to MTBC, which made up the majority of the account revenue purchased by MTBC, were valid and collectable, (d) that the only reason for the delay in payment by Moore Eye on accounts receivable was due to a lack of focus to collect the same and that limited effort would be required to cause Moore Eye to bring this account to date, and (e) that QHR's subsidiary had not breached its contract with Moore Eye.

40. Said fraudulent misrepresentations that were made to MTBC, or representatives of MTBC, were material to the bargained for promises of QHR.

41. Said fraudulent misrepresentations that were made to MTBC, or representatives of MTBC, were made with the intent of misleading MTBC into relying upon one or more or all of them.

42. MTBC justifiably relied upon the misrepresentations and did not learn of the misrepresentations until after the complete execution of the Asset Purchase Agreement.

43. MTBC suffered the following injuries and damages, which were proximately caused by such reliance: (a) Loss of payment of $372.559.49 in invoices due from Moore Eye and (b) More than $75,000,00 in additional commissions owed to MTBC.

**WHEREFORE**, MTBC demands judgment against QHR Technologies, Inc. for the amount of any damages incurred by MTBC as a result of the fraudulent acts or omissions by QHR, plus reasonable attorney's fees and costs and such other and further relief as may be just and appropriate.

## SECOND CAUSE OF ACTION

### Indemnification

44. MTBC incorporates herein by reference the allegations contained in Paragraphs 1 through 43 above.

45. SoftCare c/o QHR agreed to indemnify MTBC from and against any damages sustained by MTBC as a result of a material breach of any warranty and representation.

46. Moore Eye has alleged, in the Complaint and verbally, that Moore Eye had in fact advised SoftCare of its belief that SoftCare violated applicable statutes and/or regulations and that it had in fact threatened to assert claims against SoftCare.

47. SoftCare c/o QHR's indemnification obligations to MTBC under the Asset Purchase Agreement are capped under the terms of the agreement at $100,000.00.

**WHEREFORE**, MTBC demands judgment against QHR Technologies, Inc in the amount of $100,000.00 plus reasonable attorney's fees and costs and such other and further relief as may be just and appropriate.

## THIRD CAUSE OF ACTION

### Indemnification

48. MTBC incorporates herein by reference the allegations contained in Paragraphs 1 through 47 above.

49. Moore Eye has also alleged, in the Complaint, that it suffered damages as a result of contractual breaches by QHR and that MTBC is liable for such damages.

50. If MTBC is found liable to Moore Eye for damages sustained by Moore Eye as a result of contractual breaches, acts or omissions by SoftCare Solutions c/o QHR, QHR is primarily liable to Moore Eye with respect to such damages and QHR liable to MTBC for such damages.

**WHEREFORE**, MTBC demands judgment against QHR Technologies, Inc. for the amount of any liability incurred by MTBC as a result of contractual breaches, acts or omissions by SoftCare Solutions c/o QHR, plus reasonable attorney's fees and costs and such other and further relief as may be just and appropriate.

**FOURTH CAUSE OF ACTION**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

51. Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 50 above.

52. The aforementioned allegations contained in this Complaint evidence a breach of the implied covenant of good faith and fair dealing inherent in all agreements in the State of New Jersey.

53. As a direct and proximate result of Defendant's breach of said covenant, Plaintiff has sustained actual damages.

**WHEREFORE,** Plaintiff demands judgment against Defendant for actual damages in an amount to be determined at trial, plus attorney's fees, costs and such further relief as the Court deems just and appropriate.

Dated: November 18, 2016

By: ____________________

Melissa L. Paget
Litigation Attorney o/b/o MTBC
7 Clyde Road
Somerset, New Jersey 08873
mpaget@mtbc.com
Tel No. 732-873-5133

# Exhibit A

12/20/2012 03:06 6106904910 MOORE EYE INSTITUTE PAGE 02

## i-Plexus Billing Solutions Contract

1. This Agreement is entered into on December 19, 2012 between i-Plexus Solutions, Inc. located at 8346 Forest Oaks Blvd, Spring Hill, FL 34606 thereafter known as "i-Plexus" Moore Eye Institute (MEI), located at 100 West Sproul Road, Suite 100 Springfield, PA 19064, thereafter known as "Customer".

2. Term & Termination This Agreement is in effect for two year and automatically renews for successive one-year terms thereafter unless either party provides 120 days written notice of termination. Either party at any time may terminate this Agreement with at least 120 days written notice. After two years, but the customer can do so after one year.
   a. In the event that the agreement is terminated by either party:
      i. i-Plexus will provide assistance in transitioning to the new billing organization (in-house function or outsourced function)
      ii. i-Plexus will receive the fee of 3.85% for those payments collected on charges that were billed prior to the transition to the new billing organization.
   b. Should MEI terminate this agreement within the first 9 months of the contract signature date, i-Plexus will be reimbursed for the NextTech software cost which is $13,250.
   c. Should MEI continue with i-Plexus for a three year period, MEI will be relieved of any responsibility to reimburse i-Plexus for cost related to the NexTech PM/EMR system. Please see Addendum B for sliding scale of payment should the agreement be terminated prior to three years from contract signature date.
   d. Should i-Plexus or MEI terminate this agreement after three years from the contract signature date, i-Plexus will return those user licenses purchased to MEI for their use at no charge.

The billing service will commence on January 1, 2013.

3. Fees: 3.85% of monthly collections. Moore Eye will not be billed for those payments collected on charges that were billed prior to the transition to i-Plexus January 1st, 2013. After one year from EMR go-live, the fee can go up if the customer is not having 90% of the charges generated from the electronic medical record charting process. However, this 90% does not apply to Dr. Leonard Ginsburg for two years from the Moore Eye EMR go-live. The fee will exclude payments for Lucentis, Eylea, and any other similar J and Q Codes that may arise in the future so long as these J-codes are properly coded and do not require chronic payer appealing. Should the level of appeals becomes (too) high, i-Plexus will notify Moore Eye in writing that percent of payment is at risk to increase. Moore Eye will have 120 days from date of notification to correct issue prior to negotiation of a mutually acceptable agreement.

4. i-Plexus will issue an invoice to Customer at the end of each month for the fees earned during that month. Customer agrees that i-Plexus will debit Customer's credit card account before the 15th of the month for services provided for the previous month.

VISA MasterCard AMEX Discover

Please Circle the Card Type Above
Provide Credit Card Number Here 3727 387596 01052
Provide Name as it appears on the card Chris Kaun
Expiration Date of Credit Card: Month 11 Year 15
I agree to authorize i-Plexus to process the above credit card automatically every month for these services
Signature

5. Liability: i-Plexus's liability with respect to processing or submission of Customer's transactions shall be limited to re-processing and re-submission of such transactions at no additional charge to Customer. In all other cases, i-Plexus's liability for direct damages shall be limited to 10% of the billing during the time frame in which the damages were incurred, to the Customer. Should i-Plexus's management or staff perform in a grossly negligent manner relating to the i-Plexus's responsibilities of this contract and causes a negative financial impact to Customer, i-Plexus's

i-Plexus
Solutions

liability with respect to damages caused by said gross negligence will be 100% of the negative financial impact incurred by the Customer. Prior to these the enforcement of the damges, there will be a cure period in which I-Plexus will attempt to rectify the impact of the negligence. In no event will I-Plexus be liable for any indirect, incidental or consequential damages. Further, in no event shall I-Plexus be liable for loss or damage resulting, directly or indirectly, in whole or in part, from any act, omission, delay, fault, insolvency, or circumstance attributable to any payer or their intermediary or clearinghouse.

Agreed and Accepted by:

I-Plexus Name and Title William Pagner President

I-Plexus Signature and Date [signature] 12-20-2012.

Customer Name and Title Leonard Ginsburg CEO/PRESIDENT MOORE EYE

Customer Signature and Date [signature] 12/20/2012

**Roles and Responsibilities of I-Plexus and Customer**

Performance Measures to be determined and worked through by both parties

**Customer Role & Responsibility**

1. Verify insurance coverage prior to delivery of care.
2. Obtain the necessary insurance authorizations for surgeries and procedures.
3. Gather and enter into billing system patient and insurance demographic information.
4. Complete coding of diagnosis and procedure codes.
5. Enter Patient Demographics.
6. Enter Patient Charges after one year from EMR go-live date if the charges are not generated through the electronic medical record (Dr. Ginsburg exception for two years).
7. Secure correct referral authorization number for any patient referral and deliver this number to I-Plexus.
8. Provision of terminals or PCs for remote access and use by I-Plexus Personnel.
9. Provide access to insurance cards and patient in-take sheets for review in the event that information entered by the customer staff is not sufficient to create a clean billing record.

**I-Plexus Role and Responsibility:**

1. Management and optimization of the Moore Eye revenue cycle, bringing it to best practice status.
2. Daily review and correction of all patient demographics, patient charges, patient point of service payments that are entered by customer's staff.
3. Reconciliation of daily and weekly billing logs against schedule to insure that all charge information has been gathered and sent to the I-Plexus billing office.
4. Daily entry of Patient Charges (for the first year after EMR go-live).
5. Daily entry of patient payments and insurance payments provided by Customer.
6. Daily claim submission to payers.
7. Daily correction of payer submission errors such as incorrect policy ID, non covered service, invalid CPT or ICD-9, etc.
8. Monthly patient statement generation to patients including the costs for print and postage.
9. Operation of call center to receive patient phone calls relating to billing inquiries. There is a toll free phone number place on patient statements that patients can call.
10. Follow up on unpaid payer balances.
11. Resolution of payer denials and/or partial pays.
12. Executive and Management reporting summarizing various aspects of charges, collections, write-offs relating to practice performance. To be mutually agreed upon.
13. Provide routine and ad-hoc provider level management reporting.
14. Dedicated personalized account manager to the liking of the Customer with the manager coming in person two times per year.
15. Ongoing credentialing for the providers.

16. Compliance with HIPAA and government regulations as they relate to the performance of billing operations on the behalf of the Customer within the terms of a Business Associate Agreement separately executed between the parties.
17. Pro-active education of the physicians and technicians pertaining to the coding of procedure codes, payer requirements, modifiers or any other critical items pertaining the accurate billing of procedures with various payer types.
18. Pro-active education specific to transition to ICD-10.
19. Employ two Customer FTEs for calendar year 2013. It is understood there will always remain 1 FTE on site paid by i-Plexus starting in 2014. The management of Moore Eye and i-Plexus have to mutually agree upon the successful candidate(s) qualifications.
20. Regular (mutually agreed frequency) auditing of the charts comparing what is charted versus what is coded. i-plexus will participate in the compliance plan and assist with prospective audits, potentially under an attorney provided by Moore.
21. Proactively validate chart documentation with charges as part of the daily charge entry process resulting in the validation of complete and appropriate coding.
22. i-Plexus certified coding staff will periodically audit and analyze charges against the documentation that is provided by MEI and recommend any coding or template changes accordingly.
23. Provide the necessary training for Moore's FTE(s) to be current on the latest CPT coding updates. The timing of said training will be determined by the availability of local and online classes. i-Plexus will review all new and modified templates and recommend any coding or template changes.
24. Provide Billing for Moore Eye Low Vision Specialists at no charge.
25. Responsible for overseeing the obtaining of SPOC for J/Q-codes and advising practice if a patients insurance will pay for the J/Q-codes. Answering patients questions after technicians have obtained SPOC.
26. Performance indicators will be established and reevaluated on an annual basis. Please see Addendum A for performance thresholds. Performance indicators will be established prior to 30 days from contract acceptance.
27. Costs for the operation of Dr.com will be the responsibility of i-Plexus after March 4, 2013. The cost will not be incurred by i-Plexus if there is a MEI delay to the go-live of March 4, 2013.
28. Proactively monitor payment levels in comparison to the MEI fee schedules to ensure that fees are adequate and avoid underpayments due to pricing.
29. i-Plexus agrees to rent space for i-Plexus employee(s) at a price not exceeding 350/month for the duration of the agreement.
30. Please refer to Addendum B for additional contract terms and conditions.

Agreed and Accepted by:

i-Plexus Name and Title William Dagher - President

i-Plexus Signature and Date [signature] 12-20-2012

Customer Name and Title Leonard Ginsburg CEO/PRESIDENT MOORE EYE

Customer Signature and Date [signature] 12/20/12

# Exhibit B

**MEDICAL TRANSCRIPTION BILLING, CORP.**

- and -

**SOFTCARE SOLUTIONS INC.**

---

# ASSET PURCHASE AGREEMENT

---

**July 10, 2015**

**TABLE OF CONTENTS**

**ARTICLE 1 INTERPRETATION** .......... 1
- 1.1 Defined Terms .......... 1
- 1.2 Schedules and Exhibits .......... 8
- 1.3 Interpretation Not Affected by Headings or Table of Contents .......... 8
- 1.4 Cross-References .......... 8
- 1.5 Number, Gender and Other Terms .......... 8
- 1.6 Statutes .......... 8
- 1.7 Calculation of Time Periods .......... 9
- 1.8 Actions on Non-Business Days .......... 9
- 1.9 Time of Essence .......... 9
- 1.10 Currency .......... 9
- 1.11 Knowledge .......... 9
- 1.12 Choice of Law .......... 9
- 1.13 Severability .......... 9
- 1.14 No *Contra Preferentum* .......... 10
- 1.15 Entire Agreement .......... 10

**ARTICLE 2 PURCHASE AND SALE** .......... 10
- 2.1 Purchase and Sale of the Purchased Assets .......... 10
- 2.2 Assumption of the Assumed Liabilities .......... 10
- 2.3 Purchase Price .......... 11
- 2.4 Adjustments to the Purchase Price .......... 11
- 2.5 Determination of the Purchase Price .......... 12
- 2.6 Payment of the Purchase Price .......... 13
- 2.7 Transfer Taxes .......... 15

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES** .......... 15
- 3.1 Representations and Warranties of the Vendor .......... 15
- 3.2 Representations and Warranties of the Purchaser .......... 20
- 3.3 Sole Representations and Warranties. .......... 21
- 3.4 Reliance .......... 21
- 3.5 Survival of Representations and Warranties of the Vendor .......... 21
- 3.6 Survival of Representations and Warranties of the Purchaser .......... 22

**ARTICLE 4 COVENANTS** .......... 22
- 4.1 Authorizations .......... 22
- 4.2 Employees .......... 22
- 4.3 Employee Plans .......... 23
- 4.4 Protected Health Information .......... 23
- 4.5 Post-Closing Operation of the Businesses. .......... 24
- 4.6 Triggering Event. .......... 25

**ARTICLE 5 CLOSING** .......... 25
- 5.1 Closing Arrangements. .......... 25
- 5.2 Vendor's Closing Documents. .......... 25
- 5.3 Purchaser's Closing Documents .......... 25

5.4 Concurrent Delivery. .......... 26

ARTICLE 6 INDEMNIFICATION .......... 26

6.1 Indemnification by the Vendor. .......... 26
6.2 Indemnification by the Purchaser. .......... 27
6.3 Limitations on Liability. .......... 27
6.4 Provisions Relating to Indemnity Claims. .......... 28
6.5 Recourse. .......... 30
6.6 Adjustment to Purchase Price. .......... 30

ARTICLE 7 MISCELLANEOUS .......... 31

7.1 Reasonable Commercial Efforts to Settle Disputes. .......... 31
7.2 Moore Eye. .......... 31
7.3 Retained Personnel. .......... 31
7.4 Facilities. .......... 31
7.5 EDI/Canadian Employee Severance. .......... 31

ARTICLE 8 GENERAL .......... 32

8.1 Public Announcements and Disclosure. .......... 32
8.2 Further Assurances. .......... 32
8.3 Notices. .......... 32
8.4 Expenses. .......... 33
8.5 Waiver. .......... 34
8.6 Amendment. .......... 34
8.7 Assignment. .......... 34
8.8 Enurement. .......... 34
8.9 Survival. .......... 34
8.10 Execution and Delivery. .......... 34
8.11 Independent Legal Advice. .......... 35

# ASSET PURCHASE AGREEMENT

**THIS AGREEMENT** is dated July 10, 2015.

**BETWEEN:**

**MEDICAL TRANSCRIPTION BILLING, CORP.**, a company formed under the Laws of Delaware, having an office at 7 Clyde Road, Somerset, New Jersey, United States of America 08873

(the "**Purchaser**")

**AND:**

**SOFTCARE SOLUTIONS INC.**, a company incorporated under the Laws of Nevada, having an office c/o QHR Technologies Inc. at 1620 Dickson Avenue, Suite 300, Kelowna, British Columbia, Canada V1Y 9Y2

(the "**Vendor**")

**WHEREAS:**

A. The Vendor carries on clearinghouse, medical billing and Tradelink EDI businesses (each a "**Business Unit**" and collectively, the "**Businesses**"); and

B. The Purchaser wishes to purchase from the Vendor, and the Vendor wishes to sell to the Purchaser, the Purchased Assets, on the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the respective covenants, agreements, representations, warranties and indemnities herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby covenant and agree as follows:

## ARTICLE 1
## INTERPRETATION

### 1.1 Defined Terms

Whenever used in this Agreement, unless there is something in the subject matter or context inconsistent therewith, the following words and terms will have the indicated meanings and grammatical variations of such words and terms will have corresponding meanings:

(a) "**Accounts Receivable**" means all accounts receivable, trade accounts, notes receivable and other debts owing to the Vendor;

(b) **"Affiliate"** has the meaning ascribed to such term by the BCBCA;

(c) **"Agreement"** means this asset purchase agreement, as amended from time to time;

(d) **"Assumed Contracts"** means the Contracts listed in Schedule 1.1(d);

(e) **"Assumed Liabilities"** means:

(i) the obligations of the Vendor for accrued and unpaid severance obligations relating to the Transferred Employees arising on or before the Closing Date, except as expressly provided to the contrary in Section 7.5; and

(ii) the debts, liabilities (whether accrued, absolute or contingent or whether liquidated or unliquidated) and obligations of the Vendor relating exclusively to any of the Businesses or the Purchased Assets arising on and after the Closing Date as identified in the Schedules as defined by Section 1.1(ss), such as trade accounts payable, accrued and unpaid expenses, employment obligations in respect of Transferred Employees (including vacation pay) and liabilities and obligations under the Replacement Plans;

(f) **"Authorization"** means, with respect to any Person, any order, permit, certificate, approval, consent, novation, waiver, license, registration, clearance or similar authorization of any Governmental Agency or other Person;

(g) **"BCBCA"** means the *Business Corporations Act* (British Columbia);

(h) **"Business Day"** means any day other than a day which is a Saturday, a Sunday or a day on which banks in Vancouver, British Columbia or the United States are not generally open for commercial banking business;

(i) **"Businesses"** has the meaning attributed in Recital A, above;

(j) **"Business Unit"** has the meaning attributed in Recital A, above;

(k) **"Canadian EDI Employees"** has the meaning attributed to it in Section 7.5;

(l) **"Cash Flow"** means payments received by Purchaser from Clients less all direct expenses incurred by Purchaser related to servicing those Clients (including salaries, benefits, contractors, office expenses, third party software and services, and all other direct expenses Purchaser deems necessary to provide services to those customers, but excluding indirect allocations and capital expenditures), regardless of whether those expenses are incurred in the U.S., Canada or any other location worldwide.

(m) **"Claims"** means claims, demands, actions and causes of action;

(n) **"Clients"** means the Persons listed in Schedule 1.1(n) as being clients of the Vendor on the Closing Date;

(o) **"Closing Date"** means July 10, 2015 or such other date as the Parties may agree upon in writing;

(p) **"Closing Payment"** has the meaning attributed to it in Section 2.6(a)(ii) of this Agreement;

(q) **"Closing Time"** means 10:00 a.m. (Vancouver, British Columbia time) on the Closing Date or such other time on the Closing Date as the Parties may agree upon;

(r) **"Contract"** means any oral or written agreement, indenture, contract, lease, deed of trust, license, option, instrument or other commitment or undertaking;

(s) **"Damages"** means all costs, losses, expenses, liabilities and amounts payable in respect of a Claim;

(t) **"Disclosure"** has the meaning attributed to it in Section 3.4 of this Agreement;

(u) **"EDI Software"** means the Software referred to on Schedule 1.1(tt) as the EDI Software;

(v) **"Employees"** means the employees of the Vendor or any of its Affiliates that are listed in Schedule 1.1(v);

(w) **"Encumbrances"** means mortgages, security interests and acquisition rights of Third Parties;

(x) **"Excluded Assets"** means all properties and assets owned or used by the Vendor other than the Purchased Assets, including:

(i) all Accounts Receivable;

(ii) all inventories;

(iii) all real property;

(iv) all vehicles;

(v) all Permits;

(vi) all bank accounts together with all cash on hand or in banks or other depositories;

(vii) all indebtedness of any of the Vendor's Affiliates, any director or officer of the Vendor or the Vendor's Affiliates or any other Third Party to the Vendor;

(viii) all income tax instalments paid by the Vendor and the right to receive any refund of Governmental Charges paid by the Vendor;

(ix) all deposits and prepaid expenses of the Vendor;

(x) all shares, securities and other interests held by the Vendor in any corporation or other Person;

(xi) all interests of the Vendor in any litigation proceedings and in the proceeds of any judgements or orders thereunder;

(xii) all interests of the Vendor in any insurance policies, including any cash surrender value thereof;

(xiii) all corporate, financial, taxation and other records of the Vendor not pertaining exclusively to any of the Businesses or the Purchased Assets;

(xiv) all properties and assets (tangible or intangible) owned or used by the Vendor in connection with its businesses other than the Businesses;

(xv) all other properties, assets, books and records owned by the Vendor and not used exclusively in connection with any of the Businesses; and

(xvi) the Vendor's rights under this Agreement;

(y) **"Exhibits"** means the exhibits attached to this Agreement;

(z) **"Final Payment"** has the meaning attributed to it in Section 2.6(a)(v) of this Agreement;

(aa) **"Fixed Assets"** means the properties and assets listed in Schedule 1.1(aa);

(bb) **"Goodwill"** means the goodwill of the Businesses;

(cc) **"Governmental Agency"** means any:

(i) multinational, federal, provincial, territorial, state, municipal, local or other government, governmental or public department, central bank, court, commission, board, bureau, agency or instrumentality, domestic or foreign;

(ii) subdivision or authority of any of the foregoing; or

(iii) *quasi*-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing;

(dd) "**Governmental Charges**" means all federal, provincial, territorial, state, municipal, local and foreign taxes, customs duties, rates, levies, withholdings, goods and services taxes, harmonized sales taxes, tolls, value-added taxes, income taxes, capital taxes, assessments, reassessments and other charges, together with all penalties, interest, fines and additions with respect thereto, paid or payable, as applicable, to any Governmental Agency;

(ee) "**Gross Fees**" means all fees earned and received but, for certainty, excludes any out-of-pocket disbursements or Governmental Charges;

(ff) "**Indemnified Party**" means a Party entitled to indemnification pursuant to Article 6;

(gg) "**Indemnifying Party**" means a Party required to indemnify an Indemnified Party pursuant to Article 6;

(hh) "**Laws**" means all applicable laws, including all statutes, codes, ordinances, decrees, rules, regulations, municipal by-laws, judicial or arbitral or administrative or ministerial or departmental or regulatory judgments, orders, decisions, rulings or awards, policies, guidelines and general principles of common and civil law and equity, binding on or affecting the Person referred to in the context in which the word is used;

(ii) "**License**" means the limited license to QHR Technologies Inc. permitting QHR Technologies Inc. to retain a copy of the EDI Software and the source code and to use the EDI Software to support existing EDI clients that are not included in the Purchased Assets, and permitting QHR Technologies to provide a copy of the EDI Software and a sublicense to those existing clients if QHR Technologies should decide to wind down its EDI business and terminate its relationship with those existing clients to enable those existing clients to continue to use the EDI Software without support;

(jj) "**Moore A/R**" has the meaning attributed in Section 2.3(c);

(kk) "**Notice**" means any notice, designation, communication, request, demand or other similar document;

(ll) "**Ordinary Course of Business**" means, in relation to an action taken by a Person, an action which:

(i) is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person; and

(ii) does not require authorization by the shareholders of such Person (or by any Person or group of Persons exercising similar authority);

(mm) **"Parties"** means the parties to this Agreement;

(nn) **"Permits"** means all licenses, permits, approvals, consents, certificates, registrations or authorizations (including those made or issued by a Governmental Agency, in respect of a Contract or otherwise) entered into or obtained by the Vendor with respect to any of the Businesses or the Purchased Assets;

(oo) **"Person"** means any individual, corporation, limited liability company, unlimited liability company, body corporate, general partnership, limited partnership, limited liability partnership, firm, joint venture, syndicate, association, capital venture fund, private equity fund, trust, trustee, executor, administrator, legal personal representative, estate, government, Governmental Agency or board or commission or authority or any other form of entity or organization, whether or not having legal status;

(pp) **"Protected Health Information"** has the meaning ascribed to such term by the regulations contained in 45 C.F.R. Parts 160 and 164;

(qq) **"Purchased Assets"** means:

(i) the Vendor's right, title and interest in and to the Assumed Contracts;

(ii) the Fixed Assets;

(iii) the Software including source code and available documentation, subject to the License;

(iv) EHNAC Certification, to the extent it is transferable;

(v) the Records; and

(vi) the Goodwill,

but excluding, for certainty, the Excluded Assets;

(rr) **"Records"** means all books and records owned by the Vendor and exclusively relating to any of the Businesses, including customer lists, operating data, files, ledgers, manuals, financial books, correspondence, credit information, research

materials, Contract documents, records of past sales, price lists, supplier lists, warranty information, employee documents, inventory data, financial statements and any other similar records in any form whatsoever (including written, printed, electronic or computer printout form);

(ss) **"Schedules"** means the schedules attached to this Agreement;

(tt) **"Software"** means the computer software (including application software, object codes and source codes) owned by the Vendor and described in Schedule 1.1(tt);

(uu) **"Tax Return"** means any report, return, declaration, election or filing of any kind with respect to Governmental Charges;

(vv) **"Term"** means the period of time commencing on the Closing Date and ending on the day that is the third anniversary of the Closing Date;

(ww) **"Third Party"** means any Person other than the Parties;

(xx) **"Trademarks"** means the trademarks, service marks, trade dress, trade names, and domain names identified in Schedule 1.1(xx);

(yy) **"Transactions"** means the purchase and sale of the Purchased Assets and all matters ancillary thereto contemplated by and in the manner provided in this Agreement; and

(zz) **"Transferred Employees"** means those Employees who are retained by the Purchaser as contemplated by Section 4.2(a).

(aaa) **"Triggering Event"** means the date during the Term upon which Purchaser can demonstrate to Vendor, to Vendor's reasonable satisfaction, that Purchaser has suffered a Unit Loss for two consecutive Biannual Periods;

(bbb) **"Unit Cash Flow"** means payments received by Purchaser from Clients of a Business Unit less all direct expenses incurred by Purchaser related to servicing those Clients (including salaries, benefits, contractors, office expenses, third party software and services, and all other direct expenses Purchaser deems necessary to provide services to those customers, but excluding indirect allocations and capital expenditures), regardless of whether those expenses are incurred in the U.S., Canada or any other location worldwide.

(ccc) **"Unit Loss"** means that Unit Cash Flow in a specific Business Unit during a Biannual Period is less than $-0-.

**1.2 Schedules and Exhibits**

(a) The following Schedules and Exhibits are incorporated into this Agreement by reference and are deemed to be a part hereof:

| | |
|---|---|
| Schedule 1.1(d) | Assumed Contracts |
| Schedule 1.1(n) | Clients |
| Schedule 1.1(v) | Employees |
| Schedule 1.1(aa) | Fixed Assets |
| Schedule 1.1(tt) | Software |
| Schedule 1.1(xx) | Trademarks |
| Schedule 3.1(d) | Authorizations |
| Schedule 3.1(e) | Accounts Receivable |
| Schedule 3.1(q) | Employee Plans |

(b) Any matter disclosed in any Schedule to this Agreement will be deemed to have been disclosed in each other Schedule to this Agreement and as an exception to each of the representations and warranties set forth in this Agreement to the extent the application of such matter to each other Schedule and representation and warranty is reasonably apparent on the face of such disclosure.

**1.3 Interpretation Not Affected by Headings or Table of Contents**

The division of this Agreement into recitals, articles, sections, paragraphs, subsections, clauses, schedules and exhibits, and the insertion of headings and a table of contents, are for convenience of reference only and will not affect the construction or interpretation of this Agreement.

**1.4 Cross-References**

Unless otherwise indicated, any reference in this Agreement to a Recital, Article, Section or other subdivision or to a Schedule or Exhibit is to the specified Recital, Article, Section or other subdivision of, or Schedule or Exhibit to, this Agreement.

**1.5 Number, Gender and Other Terms**

In this Agreement, unless the context otherwise requires, any reference to gender will include both genders, words importing the singular number will include the plural and *vice versa*, "**or**" will not be exclusive and "**including**" will not be limiting whether or not non-limiting language (such as "without limitation") is used with reference thereto.

**1.6 Statutes**

Any reference to statutes in this Agreement include the regulations promulgated thereunder, in each case as amended, re-enacted, consolidated or replaced from time to time, and in the case of any such amendment, re-enactment, consolidation or replacement,

reference herein to a particular provision will be read as referring to such amended, re-enacted, consolidated or replaced provision and also include, unless the context otherwise requires, all applicable guidelines, bulletins or policies made in connection therewith.

### 1.7 Calculation of Time Periods

In this Agreement, where a time period is expressed to begin or end at or on a specified day, or to continue to or until a specified day, the time period includes that day. Where a time period is expressed to begin after or to be from a specified day, the time period does not include that day. Where anything is to be done within a time period expressed after, from or before a specified day, the time period does not include that day.

### 1.8 Actions on Non-Business Days

If any payment is required to be made or other action (including the giving of Notice) is required to be taken pursuant to this Agreement on a day which is not a Business Day, then such payment or action will be considered to have been made or taken in compliance with this Agreement if made or taken on the next succeeding Business Day.

### 1.9 Time of Essence

Time will be of the essence of every provision of this Agreement.

### 1.10 Currency

Unless otherwise indicated, all references to dollar amounts in this Agreement are expressed in United States currency.

### 1.11 Knowledge

Any reference herein to "**to the knowledge**" or "**to the best of the knowledge**" of a Party or words to like effect will be deemed to mean, in the case of the Vendor, the current, actual knowledge of the directors and officers of the Vendor and, in the case of the Purchaser, the current, actual knowledge of the directors and officers of the Purchaser.

### 1.12 Choice of Law

This Agreement and each of the documents contemplated by or delivered under or in connection with this Agreement (to the extent no choice of law is specified therein) will be governed by and construed in accordance with the Laws of the Province of British Columbia and the federal laws of Canada applicable therein (without reference to conflicts of laws principles).

### 1.13 Severability

If any covenant or other provision of this Agreement is invalid, illegal or incapable of being enforced by reason of any rule of law or public policy, then such covenant or other

provision will be severed from and will not affect any other provision of this Agreement and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement. All other conditions and provisions of this Agreement will, nevertheless, remain in full force and effect and no covenant or provision will be deemed dependent upon any other covenant or provision unless so expressed herein.

**1.14 *No Contra Preferentum***

The Parties acknowledge that their respective legal counsel have reviewed and participated in settling the terms of this Agreement and the Parties agree that any rule of construction to the effect that any ambiguity is to be resolved against the drafting Party will not be applicable in the interpretation of this Agreement. For certainty, the language in all parts of this Agreement will in all cases be construed as a whole and neither strictly for nor strictly against either of the Parties.

**1.15 Entire Agreement**

This Agreement constitutes the entire agreement between the Parties and supersedes all prior agreements, representations, warranties, statements, promises, information, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof, including the letter dated June 5, 2015 between the Parties.

## ARTICLE 2
## PURCHASE AND SALE

**2.1 Purchase and Sale of the Purchased Assets**

As of the Closing Time and on the terms and subject to the fulfilment of the conditions of this Agreement, the Vendor agrees to sell, assign and transfer to the Purchaser, and the Purchaser agrees to purchase from the Vendor:

(a) the Purchased Assets, free and clear of all Encumbrances; and

(b) All right, title and interest of the Vendor in and to the Trademarks on an "as is, where is" quitclaim basis, subject to all Claims, Encumbrances and similar matters as may exist in respect of the Trademarks at or after the Closing Date.

**2.2 Assumption of the Assumed Liabilities**

As of the Closing Date and on the terms and subject to the fulfilment of the conditions of this Agreement, the Purchaser agrees to assume the Assumed Liabilities from the Vendor and to pay, perform, discharge or otherwise be responsible for the Assumed Liabilities.

**2.3 Purchase Price**

The aggregate consideration payable by the Purchaser to the Vendor for the Purchased Assets (the "**Purchase Price**") will, subject to adjustment in accordance with Section 2.4, be:

(a) 5% of all Gross Fees that were earned and, except for Moore Eye, received by the Vendor from Clients prior to Closing or are billed by the Vendor to Clients on or before the 10th day following the Closing Date. This amount relates solely to fees for services rendered by the Vendor to Clients during the 12-month period immediately preceding the Closing Date (the "**First Trailing Amount**"); plus

(b) 30% of all Gross Fees that are earned during the Term and received by the Purchaser from Clients on or before the 60th day following the end of the Term for services rendered by the Purchaser to Clients during the three-year period commencing on the Closing Date; plus

(c) 50% of all Accounts Receivable collected by Purchaser from Moore Eye on or before the end of the Term ("**Moore A/R**"); plus

(d) 5% of all Gross Fees that are earned and received by the Purchaser from Clients on or before the end of the Term for services rendered by the Purchaser to Clients during the 12-month period commencing on the second anniversary of the Closing Date (the "**Final Payment**"); plus or minus, as applicable

(e) the Adjustments;

For the purposes of completing the Transactions at Closing, the Parties have estimated the First Trailing Amount to be $80,015.00 (the "**Estimated First Trailing Amount**"). For certainty, the Parties acknowledge and agree that the First Trailing Amount will be finally determined in the manner set forth in this Article 2.

**2.4 Adjustments to the Purchase Price**

(a) All revenues and expenses of the Businesses and relating to the Purchased Assets will be adjusted (the "**Adjustments**") as at the Closing Date to the effect that except as otherwise set forth herein:

(i) up to the Closing Date, the Vendor will bear all expenses and receive all revenues relating to the Businesses and the Purchased Assets; and

(ii) from and after the Closing Date, the Purchaser will bear all expenses and receive all revenues relating to the Businesses and the Purchased Assets and the Assumed Liabilities.

(b) The Parties will deliver a statement of adjustments on closing setting out the Adjustments (the "**Statement of Adjustments**").

(c) Any Adjustments not made at Closing will be adjusted directly between the Parties within 60 days after the Closing Date.

**2.5 Determination of the Purchase Price**

(a) Within 30 days after the close of each of the six biannual (six-month) periods during the Term (each, a "**Biannual Period**"), the Purchaser will, acting reasonably and in good faith, determine (i) the Gross Fees that were received by the Purchaser from Clients during such Biannual Period for services rendered by the Purchaser to Clients from and after the Closing Date (in each case, the "**Biannual Billings**") and (ii) the amount of Moore A/R received by the Purchaser during such Biannual Period, and shall deliver to the Vendor a statement of such Moore A/R and Biannual Billings, itemized by Client (in each case, the "**Biannual Billings Statement**, together with related working papers and other reasonable supporting documentation.

(b) Within 30 days of the Closing Date, the Parties will, acting reasonably and in good faith, mutually determine the First Trailing Amount.

(c) Within 90 days after the final Biannual Period, the Purchaser will, acting reasonably and in good faith, determine the Final Payment and, together with the final Biannual Billings Statement, deliver to the Vendor a statement of the Final Payment, itemized by Client and specifying the Gross Fees per Client and the amount of Moore A/R upon which the Final Payment is calculated (the "**Final Payment Statement**"), together with related working papers and other reasonable supporting documentation.

(d) The Vendor may dispute any Biannual Billings Statement or the Final Payment Statement or the Purchaser may dispute the First Trailing Amount Statement (in any case, an "**Accounting Dispute**") by delivery of written notice to the other Party (a "**Dispute Notice**") specifying the basis of the Accounting Dispute within 20 Business Days after delivery by the non-disputing Party to the disputing Party of the applicable Biannual Billings Statement, First Trailing Amount Statement or Final Payment Statement, as the case may be. If a Dispute Notice is delivered by a Party in accordance with the foregoing, the Parties will work diligently, reasonably and in good faith to resolve the Accounting Dispute within 15 Business Days after delivery of the Dispute Notice by the disputing Party to the non-disputing Party, failing which the Accounting Dispute will be promptly submitted by the Parties to a mutually agreed upon accounting firm (in either case, the "**Independent Accountant**"), with a mandate to resolve the Accounting Dispute within 30 days after the Independent Accountant's appointment. The determination by the Independent Accountant will be final and binding on the Parties.

If the Independent Accountant determines that the applicable Biannual Billings or Final Payment were understated by 5% or more, then the Purchaser will pay 100% of the costs and expenses of the Independent Accountant; If the Independent Accountant determines that the applicable Biannual Billings, First Trailing Amount or Final Payment were not understated by 5% or more, then the Vendor will pay 100% of the costs and expenses of the Independent Accountant.

(e) For certainty, each Biannual Billings Statement or the Final Payment Statement, as the case may be, will be deemed to be final and binding on the Parties upon the earliest of the following to occur:

(i) the Vendor gives written notice to the Purchaser that it agrees with the applicable Biannual Billings Statement or Final Payment Statement or the Purchaser gives written notice to the Vendor that it agrees with the First Trailing Amount Statement, as the case may be, within 20 Business Days after such Biannual Billings Statement, First Trailing Statement or Final Payment Statement is delivered to the Purchaser or the Vendor, as the case may be;

(ii) the Vendor does not give written notice to the Purchaser that it disputes the applicable Biannual Billings Statement or Final Payment Statement or the Purchaser does not give written notice to the Vendor that it disputes the First Trailing Amount Statement, as the case may be, within 20 Business Days after such Biannual Billings Statement, First Trailing Amount Statement or Final Payment Statement is delivered to the Purchaser or the Vendor, as the case may be;

(iii) the Parties mutually resolve all applicable Accounting Disputes within 15 Business Days after the delivery of all applicable Dispute Notices; or

(iv) the Independent Accountant makes a determination of all applicable Accounting Disputes in accordance with Section 2.5(d).

**2.6 Payment of the Purchase Price**

(a) The Purchase Price will be paid and satisfied as follows:

(i) One Thousand Eight Hundred Eighty-Eight Dollars ($1,888) at closing on the Closing Date;

(ii) within five business days after the First Trailing Account Statement is deemed final and binding in accordance with Section 2.5 (b) at the Closing Time, the Purchaser will pay, or cause to be paid, to Vendor, by certified cheque, bank draft, cashier's cheque, wire transfer or other means of immediately available funds, an amount equal to the First

Trailing Amount less the One Thousand Eight Hundred Eighty-Eight Dollars ($1,888) paid pursuant to Section 2.6(a)(i), above, as adjusted by the Adjustments described in Section 2.4(a) and as set out in the Statement of Adjustments (the "**Closing Payment**");

(iii) at the Closing Time, the Purchaser will assume the Assumed Liabilities from the Vendor;

(iv) within five Business Days after each Biannual Billings Statement is deemed final and binding in accordance with Section 2.5(e), the Purchaser will pay, or cause to be paid, to the Vendor, by certified cheque, bank draft, cashier's cheque, wire transfer or other means of immediately available funds, 30% of the Biannual Billings as set out in the applicable Biannual Billings Statement together with 50% of any Moore A/R collected during such Biannual Period (the "Instalment Payments"); and

(v) within five Business Days after the Final Payment Statement is deemed final and binding in accordance with Section 2.5(e), the Purchaser will pay, or cause to be paid, to the Vendor, by certified cheque, bank draft, cashier's cheque, wire transfer or other means of immediately available funds, the Final Payment (the "**Final Payment**").

(b) The Parties acknowledge and confirm the payment by the Purchaser to the Vendor on June 11, 2015 of a deposit in the amount of $20,000.00 (the "**Deposit**") which will, notwithstanding the foregoing provisions of this Section 2.6 or anything else contained in this Agreement, be credited against any payments that are required to be made by the Purchaser to the Vendor as the Closing Payment in accordance with the foregoing provisions of this Section 2.6.

(c) Notwithstanding the foregoing, Purchaser shall not be required to make a payment under section 2.6(a)(iv) relative to any periods during which Cash Flow was negative. Moreover, in the event that the amount due relative to any particular period is greater than the positive Cash Flow generated during such period, then the amount of said payment shall be equal to the positive Cash Flow. Finally, in the event that Cash Flow is equal to or greater than the amount due during any such period, than the full payment set forth in section 2.6(a)(iv) shall be made as and when set forth therein.

(d) Further notwithstanding the above, contemporaneous with Purchaser's payment of the Final Payment, Purchaser shall make a true-up payment to Vendor equal to, but not greater than, cumulative positive Cash Flow during the 36 months following the Closing Date, the sum of the gross payments that were due under section 2.6 (i.e., the First and Final Payments and all Biannual Billings amounts, without consideration of the Cash Flow, less the Deposit and any Adjustments),

minus all payments already made under section 2.6 by Purchaser to Vendor. The total of this payment plus the Closing Payment, Instalment Payments and Final Payment shall never be greater than cumulative positive Cash Flow during the 36 months following the Closing Date.

### 2.7 Transfer Taxes

The Vendor will be liable for and will pay all Governmental Charges (including any retail sales taxes) and all other taxes, duties, fees and other like charges of any jurisdiction properly payable in connection with the transfer of the Purchased Assets by the Vendor to the Purchaser. The Vendor will pay such Governmental Charges by the prescribed time(s) to the Vendor or directly to the appropriate Governmental Agencies, as required.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

### 3.1 Representations and Warranties of the Vendor

The Vendor represents and warrants to the Purchaser as of the date of this Agreement as follows:

(a) **Incorporation and Existence of the Vendor.** The Vendor is a corporation duly incorporated and validly existing under the Laws of Nevada.

(b) **Corporate Power and Capacity.** The Vendor has the corporate power, authority and capacity to own or lease its property, including the Purchased Assets, and to carry on the Businesses as now being conducted by it.

(c) **Validity of Agreement.**

(i) The Vendor has all necessary corporate power and capacity to enter into and perform its obligations under this Agreement and any other agreements or instruments to be delivered or given by it pursuant to this Agreement.

(ii) The execution, delivery and performance by the Vendor of this Agreement and the consummation of the Transactions have been duly authorized by all necessary corporate action on the part of the Vendor.

(iii) This Agreement and any other agreements entered into pursuant to this Agreement to which the Vendor is a party constitute or will constitute legal, valid and binding obligations of the Vendor, enforceable against the Vendor in accordance with their respective terms, except as enforcement may be limited by bankruptcy, insolvency or other Laws affecting the rights of creditors generally and except that equitable remedies may be granted only in the discretion of a court of competent jurisdiction.

(d) **Authorizations.** There is no requirement for the Vendor to make any filing with, give any notice to or obtain any consent or Authorization from any Governmental Agency as a condition to the lawful consummation of the Transactions.

(e) **Accounts Receivable.** Schedule 3.1(e) provides an accurate and complete breakdown and aging of all accounts receivable, notes receivable and other receivables of the Vendor as of the date of the Schedule. Excepted as set forth in Schedule 3.1(e), all existing accounts receivable of the Vendor: (i) represent valid obligations of customers of the Vendor arising from bona fide transactions entered into in the Ordinary Course of Business; and (ii) except for Moore Eye, are current and, to the Vendor's knowledge and without independent inquiry, will be collected in full (without any counterclaim or setoff).

(f) **No Violation.** Subject to obtaining the Authorizations listed in Schedule 3.1(d), the execution and delivery of this Agreement by the Vendor, the consummation of the Transactions and the fulfilment by the Vendor of the terms, conditions and provisions hereof will not (with or without the giving of notice or lapse of time, or both):

(i) contravene or violate or result in a breach or a default under or give rise to a right of termination, amendment or cancellation or the acceleration of any obligations of the Vendor under:

A. any Law;

B. any judgment, order, writ, injunction or decree of any Governmental Agency having jurisdiction over the Vendor;

C. the constating documents or any resolutions of the board of directors or shareholders of the Vendor; or

(ii) result in the creation or imposition of any Encumbrance on any of the Purchased Assets.

(g) **No Other Agreements to Purchase.** Except for the Purchaser's rights pursuant to this Agreement, no Person has any option, warrant, right, call, commitment, conversion right, right of exchange or other Contract or any right or privilege (whether by Law, pre-emptive or contractual) capable of becoming an option, commitment, conversion right, right of exchange or other Contract for the purchase from the Vendor of any of the Purchased Assets.

(h) **Tax Matters.**

(i) The Purchased Assets are not and will not on the Closing Date be subject to any Encumbrances or, to Vendor's knowledge, Claims arising as a

result of any Taxes due for any period prior to the Closing Date. If any such taxes remain due and owing at Closing, Purchaser shall have the right to proceed to Closing and Vendor shall immediately pay such Taxes.

(ii) The Vendor has filed on a timely basis all Tax Returns required to be filed by it and, to the Vendor's knowledge, all such Tax Returns are complete and accurate in all material respects.

(iii) All Governmental Charges due from or payable by the Vendor for periods (or portions thereof) ending on or prior to the date hereof and the Closing Date have been or will be paid, as applicable.

(iv) All required instalments or other payments on account of Governmental Charges that relate to periods for which Tax Returns are not yet due have been paid on a timely basis.

(v) There are no actions, objections, appeals, suits or other proceedings or Claims in progress, pending or, to the Vendor's knowledge, threatened by or against the Vendor in respect of any Governmental Charges.

(vi) The Vendor has withheld, collected and paid to the proper Governmental Agencies all Governmental Charges required to have been withheld, collected and paid in connection with:

A. amounts paid, credited or owing to any employee, independent or dependent contractor, creditor, shareholder or other Third Party; and

B. goods and services received from or provided to any Person.

(i) **Agreements.** Prior to Closing, the Vendor will provide Purchaser with true, correct and complete copies of Agreements corresponding with Schedule 1.1(d) and Schedule 1.1(n), as applicable, and by executing this Agreement the Purchaser acknowledges that it has had an adequate opportunity to review all of Vendor's Agreements. Vendor represents that, except as disclosed on Schedule 1.1(n), every Client referenced in Schedule 1.1(n) has executed an Agreement and said Agreement is, to Vendor's knowledge, in full force and effect as to the date hereof and that neither the Vendor, nor, to Vendor's knowledge, any other party thereto, is in breach of or in default of the same. Vendor further warrants and represents that, except as disclosed on Schedule 1.1(n), no current Client has indicated during the past twelve months through written notice of breach or termination that Vendor is in breach relative to any Agreement or, to Vendor's knowledge, through oral or other type of communication. To Vendor's knowledge, each Agreement described on Schedule 1.1(d) or Schedule 1.1(n)

contains, as written, all of the parties' respective rights, responsibilities and obligations thereunder.

(j) **Litigation**. There is no threatened or pending adverse Litigation or Claim or, to Vendor's knowledge, audit or governmental investigation, involving Vendor or, to Vendor's knowledge, any of the Purchased Assets that has not been disclosed to Purchaser.

(k) **Broker's Fees**. Purchaser has retained Corporate Finance Advisors, Inc. (Ron Salupo) as the "retained broker" and shall be liable for brokerage fees due to same. Vendor represents that it has not engaged any other broker in respect of the Transactions. Vendor and Purchaser shall each indemnify and hold the other harmless from and against any and all claims, demands, causes of action, debts or liabilities arising out of or on account of a claim by any other broker, finder, investment banker or agent that he, she or it is entitled to a commission or fees as a result of being retained or used by the other party.

(l) **Legal Compliance**. Vendor has not received any notice of any investigation, audit or violation of any applicable federal, state or local statute or regulation.

(m) **Debts, Liabilities, Claims and Liens.** Vendor has good and marketable title to the Purchased Assets, free and clear of Encumbrances. Vendor shall, at its sole cost and expense, satisfy or otherwise resolve any and all Claims, tax obligations, Encumbrances or other liabilities with respect to the Purchased Assets other than the Assumed Liabilities.

(n) **Full Disclosure**. To Vendor's knowledge, no representation or warranty provided herein by Vendor, or information supplied by Vendor to Purchaser, or omission of relevant fact by Vendor is false or misleading with respect to any material fact.

(o) **Non-Solicitation.**

(i) Vendor covenants that for a period of five (5) years following the Closing Date it shall not directly or indirectly induce or seek to (i) influence any employee of the Purchaser or any of its affiliates to terminate his or her employment; (ii) knowingly hire and/or aid a competitor of the Purchaser in hiring a current or former employee of the Purchaser; or (iii) induce or seek to influence any Clients not to do business with the Purchaser.

(ii) Vendor acknowledges that the restrictive period contained in Section 3.1(o)(i) is reasonable under the circumstances. Moreover, it is the desire and intent of the parties that the provisions of Section 3.1(o)(i) be enforceable to the fullest extent permissible under the legal requirements and public policies applied in each jurisdiction in which enforcement is sought. Vendor specifically agrees that, in the event of a

breach or threatened breach of Section 3.1(o)(i), the Purchaser would suffer irreparable injury and damages at law would be an insufficient remedy, and the Purchaser shall be entitled to seek equitable relief by way of temporary or permanent injunction (or any other equitable remedies), without proof of actual damages and without the need to post bond or other security.

(p) **Labour and Employment Matters.**

(i) Neither the Vendor nor any of its Affiliates has, in relation to any of the Employees, made any Contract with any labour union or employee association nor has it made commitments to or conducted negotiations with any labour union or employee association with respect to any future agreements.

(ii) To the Vendor's knowledge, there are no current attempts to organize or establish any labour union or employee association with respect to any of the Employees, nor is there any certification of any such union with regard to a bargaining unit in relation to such Employees.

(iii) Schedule 1.1(v) specifies, for each Employee, the location, hire date, title or position, wage or salary and bonus entitlement for each such Employee and whether or not such Employee has a written employment Contract with the Vendor or any of its Affiliates.

(q) **Employee Plans.**

(i) Schedule 3.1(q) identifies each retirement, savings, pension, bonus, stock purchase, profit-sharing, stock option, deferred compensation, severance or termination pay, overtime, insurance, medical, hospital, dental, vision care, drug, sick leave, disability, salary continuation, legal benefits, unemployment benefits, vacation, incentive or other benefit or compensation plan, trust, Contract, policy, commitment or arrangement or other employee benefit plan that is maintained or otherwise contributed to, or required to be contributed to, by the Vendor or any of its Affiliates relating to any of the Businesses or the Purchased Assets for the benefit of Employees, with the exception of any plans established pursuant to Law (the "**Employee Plans**").

(ii) To the Vendor's knowledge, each Employee Plan has been maintained in compliance with its terms and with the requirements prescribed by any and all Laws that are applicable to such Employee Plan.

**3.2 Representations and Warranties of the Purchaser**

The Purchaser represents and warrants to the Vendor as of the date of this Agreement as follows:

(a) **Incorporation and Existence of the Purchaser.** The Purchaser is a corporation duly formed and validly existing under the Laws of State of Delaware.

(b) **Validity of Agreement.**

(i) The Purchaser has all necessary corporate power to enter into and perform its obligations under this Agreement and any other agreements or instruments to be delivered or given by it pursuant to this Agreement.

(ii) The execution, delivery and performance by the Purchaser of this Agreement and the consummation of the Transactions have been duly authorized by all necessary corporate action on the part of the Purchaser.

(iii) This Agreement and any other agreements entered into pursuant to this Agreement to which the Purchaser is a party constitute or will constitute legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except as enforcement may be limited by bankruptcy, insolvency or other Laws affecting the rights of creditors generally and except that equitable remedies may be granted only in the discretion of a court of competent jurisdiction.

(c) **Authorizations.** There is no requirement for the Purchaser to make any filing with, give any notice to or obtain any consent or Authorization from any Governmental Agency or any other Third Party as a condition to the lawful consummation of the Transactions.

(d) **No Violation.** The execution and delivery of this Agreement by the Purchaser, the consummation of the Transactions and the fulfilment by the Purchaser of the terms, conditions and provisions hereof will not (with or without the giving of notice or lapse of time, or both) contravene or violate or result in a breach or a default under or give rise to a right of termination, amendment or cancellation or the acceleration of any obligations of the Purchaser under:

(i) any Law;

(ii) any judgment, order, writ, injunction or decree of any Governmental Agency having jurisdiction over the Purchaser;

(iii) the constating documents or any resolutions of the board of directors or shareholders of the Purchaser; or

(iv) the provisions of any Contract to which the Purchaser is a party or by which it is, or any of its properties or assets are, bound.

(e) **No Knowledge of Inaccuracy of Vendor's Representations and Warranties.** The Purchaser does not have any knowledge that any of the representations or warranties of the Vendor as set forth in this Agreement is in any way inaccurate or untrue.

**3.3 Sole Representations and Warranties.**

The Parties make no representations or warranties of any kind or nature, express or implied, at law or in equity, except as expressly set forth in this Agreement or in any certificate executed and delivered pursuant to this Agreement. Each Party hereby expressly negates and disclaims, and will not be liable for, any and all representations or warranties which may have been made or alleged to have been made in any other document or instrument or in any statement or information made or communicated to any other Party in any manner that is not expressly set forth in this Agreement or any a certificate executed and delivered pursuant to this Agreement. Without limiting the generality of the foregoing, the Vendor expressly negates and disclaims any representations or warranties relating to the Purchased Assets other than as set forth in this Agreement and the Purchaser acknowledges, agrees and confirms that, except as expressly set forth in this Agreement to the contrary, the Purchased Assets are being purchased and sold "as is, where is".

**3.4 Reliance**

Notwithstanding anything else contained in this Agreement, the Purchaser acknowledges that the Vendor or the Vendor's agents or professional advisors have disclosed in writing facts, circumstances and other information about the Vendor, the Businesses and the Purchased Assets, in an electronic data room, the Schedules to this Agreement and otherwise, to the Purchaser or the Purchaser's agents or professional advisors (the "**Disclosure**"). For certainty, Disclosure includes the content of any documents or instruments referenced in the Schedules or otherwise delivered or made available to the Purchaser or the Purchaser's agents or professional advisors. The Purchaser hereby releases and waives any and all Claims, Damages and rights to indemnity pursuant to Article 6 that the Purchaser may have against the Vendor in connection with the breach of a representation or warranty that, by reason of the Disclosure, the Purchaser knows to be inaccurate or untrue or a reasonable person would know to be inaccurate or untrue.

**3.5 Survival of Representations and Warranties of the Vendor**

The representations and warranties made by the Vendor in this Agreement or in any certificate executed and delivered pursuant to this Agreement will survive the Closing of the Transactions and, notwithstanding such Closing, will, subject to the provisions of this Agreement, continue in full force and effect for the benefit of the Purchaser:

(a) with respect to the representations and warranties in Sections 3.1(a), 3.1(b) and 3.1(c), until the latest date permitted by Law; and

(b) with respect to all other representations and warranties, until the date that is 18 months after the Closing Date.

**3.6 Survival of Representations and Warranties of the Purchaser**

The representations and warranties made by the Purchaser in this Agreement or in any certificate executed and delivered pursuant to this Agreement will survive the Closing of the Transactions and, notwithstanding such Closing, will, subject to the provisions of this Agreement, continue in full force and effect for the benefit of the Vendor:

(a) with respect to the representations and warranties in Sections 3.2(a), 3.2(b) and 3.2(e), until the latest date permitted by Law; and

(b) with respect to all other representations and warranties, until the date that is 18 months after the Closing Date.

## ARTICLE 4
## COVENANTS

**4.1 Authorizations.**

(a) If and to the extent that any Authorization in respect of any Assumed Contract is not obtained prior to Closing, the Vendor will be forever released and discharged from the obligation to deliver such Authorization.

(b) This Agreement will not constitute an agreement to transfer or assign, or a transfer or assignment of, any Assumed Contract or any other Purchased Asset, or any benefit arising thereunder or resulting therefrom, if an attempt at transfer or assignment thereof without the required or necessary Authorization for such transfer or assignment would constitute a breach thereof or in any way adversely affect the rights of the Purchaser thereunder. In such cases, the transfer or assignment of the Assumed Contracts or other Purchased Assets will not be effective until the applicable Authorizations have been received and such Assumed Contracts or other Purchased Assets will be held by the Vendor following Closing in trust for the benefit and exclusive use of the Purchaser.

**4.2 Employees.**

(a) The Purchaser will offer employment, effective as at the Closing Time, on the same or better terms and conditions of employment as are then applicable, to all Transferred Employees in the United States. In addition, and at the same time, the Purchaser will retain the Canadian EDI Employees as independent

contractors pursuant to written agreements in form and substance acceptable to Vendor, acting reasonably.

(b) The Purchaser will recognize the prior service of the Transferred Employees with the Vendor or any of its Affiliates for the purposes of calculating any length or period of service with the Purchaser as required by any Laws (including, for certainty, in relation to severance). Furthermore, and except as contemplated to the contrary in Section 7.5, below, the Purchaser will bear and discharge all obligations and liabilities accrued on and after the Closing Time, whether arising by Contract or Law, including wages, bonuses, commissions, vacation pay, severance pay, termination pay, notice of termination of employment or pay in lieu of such notice, damages for wrongful dismissal and other employee benefits and claims in respect of all Transferred Employees. The Vendor will pay to each Transferred Employee, at or prior to the Closing Date, an amount in satisfaction of all liability for vacation time that has accrued to such Transferred Employee prior to the Closing Date.

**4.3 Employee Plans.**

(a) The Purchaser acknowledges that, in order to comply with its obligations under Section 4.2(a), it may establish replacement plans for the Transferred Employees in respect of their employment or retainer by the Purchaser from and after the Closing Time (the "**Replacement Plans**").

(b) For the purpose of determining the eligibility of Transferred Employees for membership or benefits under any Replacement Plans, their period of employment or retainer will include employment with both the Vendor or any of its Affiliates, on the one hand, and the Purchaser (whether as an employee or an independent contractor), on the other hand, and will be deemed not to have been interrupted at the Closing Time.

**4.4 Protected Health Information.**

The Purchaser covenants to and with the Vendor that it will:

(a) collect, maintain, use and disclose the Protected Health Information in compliance with Laws (including without limitation HIPAA), in compliance with Assumed Contracts and only for those purposes for which the Protected Health Information was initially collected from or in respect of the individual to which such Protected Health Information relates and which solely relates to the carrying on of any of the Businesses, unless:

(i) the Purchaser has first notified such individual of such additional purpose and, where required by Law, obtained the consent of such individual to such additional purpose; or

(ii) such use or disclosure is permitted or authorized by Law, without notice to, or consent from, such individual;

(b) where required by Law, promptly notify the individuals to whom the Protected Health Information relates that the Transactions have taken place and that the Protected Health Information has been disclosed to the Purchaser; and

(c) where the disclosure or transfer of Protected Health Information to the Purchaser requires the consent of, or the provision of notice to, the individual to which such Protected Health Information relates, to:

(i) not require or accept the disclosure or transfer of such Protected Health Information until the Purchase or the Vendor has first notified such individual of such disclosure or transfer and the purpose for same and, where required by Law, obtained the individual's consent to same; and

(ii) only collect, use and disclose such information to the extent necessary to complete the Transactions and as authorized or permitted by Law.

**4.5 Post-Closing Operation of the Businesses.**

Until the later of (i) the occurrence of a Triggering Event and (ii) the date the last Biannual Billing Statement is deemed to be final and binding in accordance with Section 2.5(e), the Purchaser covenants to:

(a) carry on the Businesses in the Ordinary Course of Business and, in particular, use commercially reasonable efforts to retain the Clients and not do anything to intentionally or negligently minimize or adversely affect the nature or extent of the services rendered by the Purchaser to the Clients or the Gross Fees resulting therefrom or relating thereto; and

(b) promptly, and in any event within 60 days after providing the applicable services, and without deduction, bill all Gross Fees to Clients for services rendered by the Purchaser to such Clients.

For the purposes of subsection 4.5(a), above, the requirement to use commercially reasonable efforts to retain a Client shall not compel Purchaser to retain any given Client (i) that is in material breach of its Contract or (ii) if, during the Biannual Period immediately prior to the Biannual Period during which the Purchaser makes the retention decision, the aggregate amount of payments received from such Client is less than the pro-rata portion of all of the direct expenses incurred by Purchaser related to servicing Clients that is attributable to such Client.

**4.6 Triggering Event.**

If Purchaser experiences a Triggering Event as to any of the three Business Units during the Term, it shall have the right to sell or wind-down that Business Unit. Proceeds of any sale of a Business Unit following a Triggering Event shall be deemed to be Gross Fees received during the Biannual Period they are earned or received. Vendor shall be released from any liability arising out of or pursuant to this Agreement in respect of a Business Unit that is sold or wound down as contemplated in this Section 4.6, with such release to be effective upon completion of the sale or commencement of the wind-down process.

**ARTICLE 5**
**CLOSING**

**5.1 Closing Arrangements.**

Subject to the terms and the fulfillment of the conditions hereof, the Transactions will be closed at the Closing Time at the offices of the Vendor's legal counsel or at such other place or places or in such other manner as the Parties may agree upon (the "**Closing**").

**5.2 Vendor's Closing Documents.**

At or before the Closing, the Vendor will execute and deliver, or cause to be executed and delivered, to the Purchaser, the following documents and instruments, in form satisfactory to the Purchaser, acting reasonably:

(a) certified copies of all necessary resolutions, authorizations and proceedings of the Vendor that are required to be taken or obtained to permit the completion of the Transactions;

(b) the Statement of Adjustments;

(c) all necessary deeds, conveyances, bills of sale, discharges, assurances, transfers, assignments and any other documentation necessary or reasonably required to transfer the Purchased Assets to the Purchaser with good and marketable title, free and clear of all Encumbrances;

(d) possession of the Purchased Assets; and

(e) such other documents and instruments as are reasonably required by the Purchaser or the Purchaser's legal counsel.

**5.3 Trademarks**

Vendor shall convey the Trademarks, as contemplated by Section 2.1(b), above, within a reasonable time following the Closing Date (not to exceed 30 days).

**5.4 Purchaser's Closing Documents.**

At or before the Closing, the Purchaser will execute and deliver, or cause to be executed and delivered, to the Vendor, the following documents and instruments, in form satisfactory to the Vendor, acting reasonably:

(a) certified copies of all necessary resolutions, authorizations and proceedings of the Purchaser that are required to be taken or obtained to permit the completion of the Transactions;

(b) the Statement of Adjustments;

(c) an assumption of the Assumed Liabilities;

(d) evidence of the offers to retain the Transferred Employees as contemplated by Sections 4.2(a) and 7.5;

(e) the License;

(f) the Closing Payment; and

(g) such other documents and instruments as are reasonably required by the Vendor or the Vendor's legal counsel.

**5.5 Concurrent Delivery.**

It will be a condition of the Closing that all matters of payment and the execution and delivery of documents by a Party to the other Party pursuant to the terms of this Agreement be concurrent requirements and that nothing will be complete until everything required as a condition precedent to the completion of the Transactions has been paid, executed and delivered, as the case may be.

## ARTICLE 6
## INDEMNIFICATION

**6.1 Indemnification by the Vendor.**

Subject to the provisions of this Article 6, the Vendor agrees to indemnify and save the Purchaser harmless from and against any Claims that may be made or brought against the Purchaser or any Damages that the Purchaser may suffer or incur as a result of, in respect of or arising out of:

(a) any non-performance or non-fulfillment of any covenant or agreement on the part of the Vendor contained in this Agreement; and

(b) any breach of any representation or warranty made by the Vendor contained in this Agreement.

**6.2 Indemnification by the Purchaser.**

Subject to the provisions of this Article 6, the Purchaser agrees to indemnify and save the Vendor harmless from and against any Claims that may be made or brought against the Vendor for any Damages that the Vendor may suffer or incur as a result of, in respect of or arising out of:

(a) any non-performance or non-fulfillment of any covenant or agreement on the part of the Purchaser contained in this Agreement;

(b) any breach of any representation or warranty made by the Purchaser contained in this Agreement;

(c) any failure by the Purchaser to fully satisfy and discharge the Assumed Liabilities; and

(d) the transfer to or use by the Purchaser of any Protected Health Information.

**6.3 Limitations on Liability.**

Notwithstanding any other provision of this Agreement:

(a) The amount that an Indemnified Party is entitled to recover under this Article 6 will be limited to $1.00 for Indemnity Claims in connection with which an Indemnity Notice is delivered after the expiry of:

(i) with respect to Indemnity Claims made pursuant to Section 6.1(b), the time periods set forth in Section 3.4;

(ii) with respect to Indemnity Claims made pursuant to Section 6.2(b), the time periods set forth in Section 3.5(b); and

(iii) with respect to all other Indemnity Claims, the maximum period of time permitted by Law.

(b) The Purchaser will not be entitled to make any Indemnity Claim against the Vendor under this Article 6 until the aggregate amount of all Damages exceeds $50,000.00 (the "**Indemnity Threshold**"). Once the aggregate amount of all such Damages exceeds the amount of the Indemnity Threshold, then the Purchaser will be entitled to make an Indemnity Claim for all Damages incurred in excess of, but not including, the amount of the Indemnity Threshold.

(c) The maximum, aggregate liability of the Vendor to the Purchaser under or in connection with this Agreement with respect to Claims that may properly be brought under this Article 6 against the Vendor will be limited to $100,000.00.

(d) No Party will have any liability to any other Party under this Article 6 to the extent:

(i) that the Indemnified Party is entitled to recover under any insurance policy with respect to any Damages forming the subject matter of the Claim;

(ii) of any related and reasonably determinable tax benefit available to the Indemnified Party as a result of the matters giving rise to the Claim;

(iii) that any Damages could reasonably have been minimized or avoided had the Indemnified Party exercised reasonable diligence and ordinary care in attempting to minimize or avoid aggravating such Damages; or

(iv) such liability arises or the amount thereof is increased as a result of a change after the Closing in the accounting policies or practices of the Indemnified Party or a change in Laws.

(e) In no circumstances will a Party be liable under this Agreement for any indirect, consequential, punitive or aggravated Damages.

(f) Each Party will use commercially reasonable efforts to mitigate any Damages for which an Indemnifying Party is required to indemnify the Indemnified Party hereunder.

**6.4 Provisions Relating to Indemnity Claims.**

Subject to the other provisions of this Article 6, the following provisions will apply to any Claim by the Purchaser or the Vendor for indemnification pursuant to this Article 6 (an "**Indemnity Claim**"):

(a) As soon as reasonably practicable after becoming aware of any matter that may give rise to an Indemnity Claim, the Purchaser or the Vendor, as the case may be, will provide to the other written notice of the Indemnity Claim (the "**Indemnity Notice**") specifying (to the extent that information is available):

(i) the factual basis for the Indemnity Claim;

(ii) the amount of the Indemnity Claim or, if an amount is not then determinable, a reasonable estimate of the amount of the Indemnity Claim; and

(iii) whether the Indemnity Claim arises as a result of a Claim by a Third Party (a "**Third Party Claim**") or not (a "**Direct Claim**").

(b) With respect to any Direct Claim, following receipt of the Indemnity Notice, the Indemnifying Party will have 30 days to make such investigations of the Direct Claim as it considers necessary or desirable. For the purpose of such investigations, the Indemnified Party will make available to the Indemnifying Party the information relied upon by the Indemnified Party to substantiate the Indemnity Claim. If the Indemnified Party and the Indemnifying Party agree at or prior to the expiration of such 30-day period as to the validity and amount of such Indemnity Claim, then the Indemnifying Party will forthwith pay to the Indemnified Party, in full, the agreed-upon amount of the Indemnity Claim. If the Indemnified Party and the Indemnifying Party do not agree on the validity or amount of the Indemnity Claim within such 30-day period, then the provisions of Article 7 will apply with respect to the resolution of the Indemnity Claim.

(c) With respect to any Third Party Claim:

(i) the Indemnifying Party will have the right, at its own expense, to participate in or assume control of the negotiation, settlement or defence of such Third Party Claim and, in such event, the Indemnifying Party will reimburse the Indemnified Party for all of the Indemnified Party's out-of-pocket expenses incurred as a result of such participation or assumption. If the Indemnifying Party elects to assume such control, the Indemnified Party will (i) cooperate with the Indemnifying Party, (ii) have the right to participate in the negotiation, settlement or defence of such Third Party Claim at its own expense and (iii) have the right to disagree on reasonable grounds with the selection and retention of legal counsel by the Indemnifying Party, in which case legal counsel satisfactory to the Indemnifying Party and the Indemnified Party will be retained by the Indemnifying Party. If the Indemnifying Party, having elected to assume such control, thereafter fails to defend any such Third Party Claim within a reasonable time, the Indemnified Party will be entitled to assume such control and the Indemnifying Party will be bound by the results obtained by the Indemnified Party with respect to such Third Party Claim;

(ii) if the Third Party Claim is of a nature such that the Indemnified Party is required by Law to make a payment to a Third Party with respect to such Third Party Claim before the completion of settlement negotiations or related legal proceedings, the Indemnified Party may make such payment and the Indemnifying Party will, forthwith after demand by the Indemnified Party, reimburse the Indemnified Party for any such payment. If the amount of any liability of the Indemnified Party under

the Third Party Claim in respect of which such a payment was made, as finally determined, is less than the amount which was paid by the Indemnifying Party to the Indemnified Party, the Indemnified Party will, forthwith after receipt of the difference from the Third Party, pay the amount of such difference to the Indemnifying Party;

(iii) except in the circumstance contemplated by Section 6.4(c)(ii), and whether or not the Indemnifying Party assumes control of the negotiation, settlement or defence of the Third Party Claim, the Indemnified Party will not negotiate, settle, compromise or pay the Third Party Claim except with the prior written consent of the Indemnifying Party, which consent will not be unreasonably withheld;

(iv) the Indemnified Party will not permit any right of appeal in respect of any Third Party Claim to terminate without giving the Indemnifying Party notice and an opportunity to contest such Third Party Claim;

(v) the Indemnified Party and the Indemnifying Party will cooperate fully with each other with respect to the Third Party Claim and will keep each other fully advised with respect thereto (including supplying copies of all relevant documentation promptly as it becomes available); and

(vi) notwithstanding Section 6.4(c)(i), the Indemnifying Party will not settle the Third Party Claim or conduct any related legal or administrative proceeding in a manner which would, in the opinion of the Indemnified Party, acting reasonably, have a material adverse impact on the Indemnified Party.

**6.5 Recourse.**

(a) The remedy of any Party in respect of the subject matter of this Agreement will be the indemnities set out in this Article 6 and each Party hereby expressly waives and renounces any other remedy whatsoever, whether at law or in equity, including rescission, to which it would otherwise be entitled in connection herewith.

(b) The Indemnified Party will not be entitled to set off the amount of any Damages subject to indemnification under this Agreement against any other amounts payable to the Indemnifying Party, whether under or pursuant to this Agreement or otherwise.

**6.6 Adjustment to Purchase Price.**

The Parties agree to treat all indemnification payments made pursuant to this Article 6 as adjustments to the Purchase Price for all purposes.

## ARTICLE 7
## MISCELLANEOUS

### 7.1 Reasonable Commercial Efforts to Settle Disputes.

If any controversy, dispute, Claim, question or difference (a "**Dispute**") arises with respect to this Agreement or its performance, enforcement, breach, termination or validity, the Parties will use commercially reasonable efforts to settle the Dispute. To this end, they will consult and negotiate with each other in good faith and understanding of their mutual interests to reach a just and equitable solution satisfactory to the Parties.

### 7.2 Moore Eye.

On the Closing Date, Vendor shall assign all rights relative to its Account Receivable from Moore Eye to Purchaser. During the Term, Purchaser shall use commercially reasonable efforts to collect this Account Receivable. Notwithstanding the foregoing, the Purchaser may provide a partial credit against the Moore Eye Account Receivable to induce Moore Eye to sign a new service agreement with the Purchaser for the performance of medical billing services.

### 7.3 Retained Personnel.

While Purchaser shall hire and become responsible for the Transferred Employees on and after the Closing Date, Vendor shall give "working notice" to all of its other employees that are still working for the Businesses in the United States on the Closing Date. Vendor will permit those other employees, to the extent they continue to work for Vendor during their respective working notice periods, to support the transition of the Purchased Assets to Purchaser. For the purposes of this Section 7.3, the term "working notice" means the minimum working notice required by applicable law plus, where such minimum working notice is for a period of two weeks, one additional week and subject, in any event, to a maximum of 30 consecutive calendar days.

### 7.4 Facilities.

Purchaser shall not assume any of the Vendor's office leases and it acknowledges that Vendor will take prompt action to cancel the Florida and Texas leases effective on or as soon as practicable after the Closing Date; however, Vendor shall permit Purchaser to utilize the same at no cost for up to 30 days after the Closing Date during normal business hours and subject to receipt of the landlord's consent, the terms of the leases and, to the extent applicable, cancellation thereof. To the extent that it is permitted access to these premises pursuant to this Section 7.4, Purchaser shall, and it shall cause its employees and agents to, conduct itself in a manner calculated to minimize disruption to the Vendor's remaining operations.

### 7.5 EDI/Canadian Employee Severance.

On the Closing Date, Vendor (or, if applicable, its affiliate QHR Technologies Inc.) shall terminate the employment of each of the Employees identified on Schedule 1.1(v) as the

**"Canadian EDI Employees"** and Purchaser will simultaneously retain them pursuant to the terms of written independent contractor agreements reasonably acceptable to Vendor. Also on the Closing Date, Vendor (or, if applicable, its affiliate QHR Technologies Inc.) shall pay to each Canadian EDI Employee an amount in satisfaction of any severance obligation arising out of the termination of such employment, which amount shall be acknowledged in writing by each Canadian EDI Employee, and each Canadian EDI Employee shall release the Vendor (or, if applicable, its affiliate QHR Technologies Inc.) from any and all Claims relating to their employment or the termination thereof.

## ARTICLE 8
## GENERAL

### 8.1 Public Announcements and Disclosure.

No announcement with respect to this Agreement will be made by a Party without the prior written consent (not to be unreasonably withheld) of the other Party. The foregoing restriction will not apply to any announcement by either Party required in order to comply with Laws or stock exchange rules or policies pertaining to timely disclosure, provided that such Party consults with the other Party before making any such announcement.

### 8.2 Further Assurances.

Each of the Parties hereby covenants and agrees that, at any time and from time to time after Closing, it will, at its expense and upon the request of any other Party, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances and assurances as may be required for the better carrying out and performance of the Transactions and the terms of this Agreement.

### 8.3 Notices.

(a) Any Notice required or permitted to be given or sent or delivered hereunder to a Party will be in writing and will be sufficiently given or sent or delivered if it is:

(i) delivered personally or by courier to such Party;

(ii) sent to such Party by registered mail, postage prepaid, mailed in the United States of America; or

(iii) sent by facsimile or email.

(b) Notices required or permitted to be given or sent or delivered hereunder to a Party will be sent to the following addresses, as applicable:

(i) in the case of the Purchaser:

7 Clyde Road
Somerset, New Jersey
United States of America 08873

Attention: Stephen Snyder
Facsimile: (732) 964-9036
Email: ssnyder@mtbc.com; or

(ii) in the case of the Vendor:

c/o QHR Technologies Inc.
1620 Dickson Avenue, Suite 300
Kelowna, British Columbia
Canada V1Y 9Y2

Attention: Mike Checkley, President
Email: mike.checkley@qhrtech.com,

or to such other address(es) or facsimile number(s) as the Party entitled to or receiving such Notice, by a Notice given in accordance with this Section 8.3, has communicated to the Party giving or sending or delivering such Notice.

(c) Any Notice given or sent or delivered as aforesaid will:

(i) if delivered personally, by courier or via email as aforesaid, be deemed to have been given, sent, delivered and received on the date of delivery;

(ii) if sent by registered mail as aforesaid, be deemed to have been given, sent, delivered and received on the fourth Business Day following the date of mailing, unless at any time between the date of mailing and the fourth Business Day thereafter there is a discontinuance or interruption of regular postal service, whether due to strike or lockout or work slowdown, affecting postal service at the point of dispatch or delivery or any intermediate point, in which case the Notice will be deemed to have been given, sent, delivered and received in the ordinary course of the mails, allowing for such discontinuance or interruption of regular postal service; or

(iii) if sent by facsimile, be deemed to have been given, sent, delivered and received on the date the sender receives the confirmation of transmission.

**8.4 Expenses.**

Each of the Parties will be responsible for its respective legal, accounting, brokerage and other professional fees in connection with this Agreement and the Transactions.

**8.5 Waiver.**

A Party that is entitled to the benefits of this Agreement may, and has the right to, waive any term or condition hereof at any time on or prior to the Closing Time, provided, however, that such waiver will only be effective if evidenced by written instrument duly executed and delivered on behalf of such Party. No waiver of any provision of this Agreement will constitute a waiver of any other provision, nor will any waiver of any provision of this Agreement constitute a continuing waiver, unless otherwise expressly provided.

**8.6 Amendment.**

No amendment or waiver of this Agreement will be binding unless executed in writing by the Party to be bound.

**8.7 Assignment.**

Neither Party may assign its rights under this Agreement or any document, instrument or agreement delivered pursuant to this Agreement, in whole or in part, without the prior written consent of the other Party.

**8.8 Enurement.**

This Agreement will be binding upon and enure to the benefit of the Parties hereto and their respective successors and permitted assigns. Nothing herein, express or implied, is intended to confer upon any Person, other than the Parties hereto and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**8.9 Survival.**

Except as otherwise specified in this Agreement, each Party agrees that no provisions of this Agreement will merge on, and all provisions of this Agreement will survive, the execution and delivery of this Agreement and the completion of the Transactions.

**8.10 Execution and Delivery.**

This Agreement may be executed in several counterparts and by facsimile or portable document format, each of which so executed will be deemed to be an original and such counterparts together will constitute one and the same instrument.

**8.11 Independent Legal Advice.**

EACH PARTY HAS BEEN ADVISED AND HAS HAD A REASONABLE OPPORTUNITY TO OBTAIN INDEPENDENT LEGAL ADVICE WITH RESPECT TO THIS AGREEMENT AND HAS DONE SO OR HAS CONSIDERED DOING SO AND, IN ITS SOLE JUDGMENT, HAS DECIDED THAT IT IS NOT NECESSARY.

**THE BALANCE OF THIS PAGE IS INTENTIONALLY BLANK**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

**MEDICAL TRANSCRIPTION BILLING, CORP.**

Per: ______________________
Authorized Signatory

**SOFTCARE SOLUTIONS INC.**

Per: ______________________
Authorized Signatory

Signature Page – Asset Purchase Agreement

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

**MEDICAL TRANSCRIPTION BILLING, CORP.**

Per: ______________________________
Authorized Signatory

**SOFTCARE SOLUTIONS INC.**

Per: ______________________________
Authorized Signatory

Signature Page – Asset Purchase Agreement

# Schedule 1.1(d)

## Assumed Contracts

1. **CLIENTS**

All clients listed in Schedule 1.1(m).

2. **OTHER**

File names listed below as listed and disclosed to the Purchaser in the data room prior to Closing.

(a) **Dell**

QHR DCD 36 month renewal SIGNED

(b) **Emdeon**

Emdeon Contract

Emdeon Contract Amendment

(c) **Relay Health**

relayhealth_trading_amendment_signed

trading_assignment_signed - Relay

VARRH-P14001186 amendment - fully executed - Relay

P1510000655 amendment-add Elig-Claim Status ECP dba i-Plexus 5-28-14_signed - Relay

VARRH-P135599659 final 50% rebate Transitional Payers - Relay

VAR_C135473043 Gateway Agreement Master-Attachments fully executed - Relay

(d) **Capario**

Capario_2nd Amend_20100916

Capario Contract

Capario I-Plexus Customer Payer List

(e) **TransUnion**

TransUnionAmendment 2 - iPlexus -5-19-14_fully executed

(f) **Availity**

Availity Contract

Availity Bilateral Clearinghouse Agreement - [May 2014]

2010 Availity Agreement

## Schedule 1.1(n)

## Clients

1. **BILLING SERVICES**

(a) **Written agreement provided to Purchaser prior to the Closing Date as part of due diligence process**

CHATEAU FOOT & ANKLE

EAST CAROLINA CENTER FOR SIGHT

MILTON SHEPPERD DO PA

MOORE EYE INSTITUTE

PALMETTO (SUNGATE MEDICAL GROUP)

TIMOTHY YOUNG MD

(b) **Other**

None.

2. **EDI**

(a) **Written agreement provided to Purchaser prior to the Closing Date as part of due diligence process**

EMPLOYERS DIRECT HEALTH

FFF ENTERPRISES INC.

INSPRO TECHNOLOGIES, LLC

KNOWLEDGEBASE MARKETING

MASSACHUSETTS BUSINESS ASSOCIATION

MAXWELL HEALTH ENTERPRISE

NATIONAL BEVERAGE CORP. (*Custom development and support services only for the national beverage web order entry portal which will be used by the shasta, faygo and everfresh brands.*)

NFP HEALTH SERVICE ADMINISTRATORS

ORLANDO BEHAVIORAL ADMINISTRATORS CORPORATION

STAT HEALTH SERVICES INC.

(b) **Other**

ANCILYZE

NORTHERN MICHIGAN REGIONAL ENTITY

VIROPHARMA

3. **CLEARINGHOUSE**

(a) **Written agreement provided to Purchaser prior to the Closing Date as part of due diligence process**

| | | |
|---|---|---|
| ACCESS CHIROPRACTIC CENTER | FAMILY CENTER FOR CHIROPRACTIC | NEEDHAM PSYCHOTHERAPY ASSOCIATES |
| ALAMO BILLING COMPANY INC | FAMILY HEALTH ASSOCIATES | NMS HEALTHCARE OF HYATTSVILLE |
| ARLINGTON OSTEOPATHIC GENERAL PRACTICE | FIRST COAST BILLING GROUP INC | NOAH K KAUFMAN PHD |
| ASSERTIVE MED BILLING - COLLECTIONS | FLETCHER CHIROPRACTIC OFFICE SC | NORTH DECATUR HEALTH CARE |
| BARTELS COUNSELING SVS INC | GENESIS COUNSELING SERVICES | NORTHWEST BILLING SYSTEMS |
| BAY RIDGE MEDICAL IMAGING | GENNARO SAGLIOCCA MD | NY MEDICAL HEALTH CARE PC |
| BENTON CHIROPRACTIC | GOLOJUH FAMILY CHIROPRACTIC | OGDEN FAMILY CHIROPRACTIC |
| BODMAN PODIATRY ASSOCIATES | HARVEY E SLUSKY MD PA | OGLETHORPE INC |
| BUCKTOWN CHIROPRACTIC HEALTH CTR | HELPING HANDS INC | ORTHOWEST LTD |
| CARE VAULT CORPORATION | INTEGRATIVE HEALTH CLINICS | P AND M BILLING SERVICES |
| CASAMBA | INTERNATIONAL MEDICAL BILLING | PALOMAKI FAMILY CHIROPRACTIC PLLC |
| CHAKRA CU NAWADA | JEFFREY GOODMAN MD | PARKVIEW GERIATRIC SERVICES, INC |
| CHAKRA HEARTLAND HEALTHCARE | JMG PODIATRY | PERK MEDICAL SYSTEMS |
| CHAKRA RAJNIKANT M KADIWAR MD | JOSEPH P HOUSEMAN CHIROPRACTIC | PLANET REHAB - LA |
| CHAKRA RAZIA B MALIK MD | KARL S STOLER OD AND ASSOC | REALIGN CHIROPRACTIC |
| CHARLES MCGRATH | KELLENBERGER CHIROPRACTIC | SIGNATURE CARE INC |
| CHESTER COUNTY INTERMEDIATE UNIT | KENG CHIROPRACTIC PC | SIMONS BILLING SERVICE |
| CHILD AND ADOLESCENT PSYCH SERVICES | LACEY CHIROPRACTIC CLINIC | SOUTH KONA PT |
| CODEDRILL LLC | LI CHIROPRACTIC ACUPUNCTURE | SPINAL AND SPORTS CARE CLINIC PS |
| COMMUNITY REHAB OF GREENVILLE INC | LIFEFORCE CHIROPRACTIC | SPINECARE LLP |
| CORNERSTONE FAMILY CHIROPRACTIC | LIGHTS CHIROPRACTIC HEALTH CENTER LLC | STEPHEN M ROBINSON PHD |
| CULVER CHIROPRACTIC | MARK WEBB AND ASSOC | SUSAN H MCHENRY |
| DALLAS PSYCHOLOGY ASSOCIATES | MARLTON PAIN CONTROL AND ACCUPUNCTURE CENTER | THE BACK SHACK LLC |
| DISCOVERY MEDICAL SERVICES | MARTEL EYE MEDICAL GROUP | THE FAMILY CONSERVANCY |
| ELDRIDGE FAMILY CHIROPRACTIC | MEDICAL DIAGNOSTIC LABORATORIES LLC | THE FIX REHAB AND WELLNESS |
| EMPIRE DIAGNOSTIC SOLUTIONS INC | MONOCACY START CENTER | THOMAS F. BODUCH MD |
| EMR SOLUTIONS INC | MY SACRED HOME LLC | TITAN ANESTHESIA ASSOCIATES LLC |
| EXEMPLO | NATURES WAY CHIROPRACTIC | TRILLIUM BILLING |
| | | WCH SERVICE BUREAU INC. |

(b) **Other**

| | | |
|---|---|---|
| ABSOLUTE REVENUE MGMT | DERM PHYSICIANS OF SJ | PR GENTILE OT HAND CLINIC INC |
| ACADEMIC DERMATOLOGY ASSOCIATES | DIMARCO BILLING SERVICE | PR GORMAN PT |
| ACTIVE CHIROPRACTIC | DIREC MANAGEMENT | PR HAND AND UPPER EXTREMITY REHAB LLC |
| ADVANCE WELLNESS CHIRO | DOSTER CHIROPRACTIC | PR HEALTH QUEST PHYSICAL THERAPY LLC |
| ADVANCED MEDICAL ASSOC OF SUMMERVILLE | DREW PROFESSIONAL | PR HEALTH QUEST PT |

| | | |
|---|---|---|
| ADVANCED MEDICAL BILLING | EDWARD P REDMOND LCSW | PR HOUSECALL REHABILITATION SERVICES LLC |
| AHCBS ACH PODIATRY LLC | ELIZABETH CITY FAMILY CHIROPRACTIC | PR INNOVATIVE SUIT THERAPY AND FITNESS |
| AHCBS BELTWAY FOOT CLINIC PLLC | ELLSWORTH FAMILY CHIROPRACTIC SC | PR INTERSTATE REHAB INC |
| AHCBS BND ENTERPRISES | EMPIRE DIAGNOSTIC SOLUTIONS MEDICAL PC | PR JULIE D TANAKA DBA THERAPY FOR LIFE |
| AHCBS COMPASSIONATE FOOT CARE CLINIC PA | EMPIRE INTERMED CARE P C | PR KAYLA ALLEN |
| AHCBS DEFRANK DMP | EMPIRE MARIAN DAVID MD | PR KURA MSPT DC MSA |
| AHCBS DENIS FOOT AND ANKLE SPECIALISTS | EMPIRE RIGNEY | PR LIVING WATERS PHYSICAL THERAPY |
| AHCBS HARRIS RAY DPM | EMPIRE TEITELMAN | PR MICHIGAN ORTHOPEDIC REHABILITATION SPECIALIST LLC |
| AHCBS HOOD DPM | ENGINEERED BILLING SOLUTIONS | PR PACIFIC NW OCCUPATIONAL THERAPY LLC |
| AHCBS JAMES F DIETZ DPM | ERNEST GUTIERREZ DC | PR PARKER PHYSICAL THERAPY AND REHAB |
| AHCBS KAREN KIKER | EYE HEALTH AND VISION CENTER | PR PERSONAL PT SERVICES |
| AHCBS MICHAEL E MCGOWAN DPM | EZRA E. COHEN OD PLLC | PR PHOENIX THERAPY SERVICES PLLC |
| AHCBS MONTICELLO PODIATRY LLC | FAMILY CLINIC | PR PHYSIOSPORTS THERAPY PLLC |
| AHCBS SEGEL | FAMILY HEALTH PARTNERS PA | PR PINE MOUNTAIN THERAPY |
| AHCBS SOUTH COAST FOOT AND ANKLE INC | FRANCISCO G TUDELA | PR PRIME PHYSICAL THERAPY LLC |
| ALAMO MENTAL HEALTH | GRANTS PASS CHIROPRACTIC | PR PROACTIVE SPINE & SPORTS PHYSICAL THERAPY |
| ALLIANCE ORTHOPEDICS | GRUPOPRO DBA PROGROUP | PR PROGRESSIVE SPORT THERAPY LLC |
| AMM ACCTG SVCS | HANDS ON VENTURES LLC | PR SOUTH FLORIDA PHYSICAL THERAPY |
| ANH SITIHAMPHONE PHETCHAMPHONE | HELEN ROSS MCNABB CENTER | PR SPINE AND SPORT PT OF WAUPACA LLC |
| APPLE VALLEY WELLNESS CENTER PA | HELPING HAND CENTER | PR STEPS FOR RECOVERY LLC |
| AUDIOLOGY AND HEARING AID CNTR | HERMAN WATSON MD | PR THE LEARNING FOUNTAIN |
| AUDIOLOGY CENTER OF ST PETERS | HOOMAN SEDIGHI M.D. P.A. | PR TOTAL ARM REHAB LLC |
| AUSTIN MEDICAL PRODUCTS INC | HOPKINS CHIROPRACTIC | PR VERNON REHAB AND PHYSICAL THERAPY PC |
| BEDMINSTER EYE AND LASER CENTER INC | HOVG BAY AREA CREDIT SERVICES | PR WINTERS HAND WORKS LLC |
| BEHAVIORAL HEALTH CONSULTANTS | IMS HEALTH | PR XCEL PHYSICAL THERAPY PLC |
| BELVILLE AND ASSOCIATES CHIROPRACTIC CLINIC | JACKIE P ORFANOS | PRACTICE MED INC |
| BROOK WALLACE | JOHN H MASSEY | PRACTICESUITE BHUPINDER BHANDARI MD INC |
| BROWN AND WISE INTERNAL MEDICINE | JOHN MASSEY CPA | PRACTICESUITE CITY MEDICAL |
| BROWN-CAVETT CHIROPRACTIC | JOHN R ISTAD DC PA | PRACTICESUITE EXECUTIVE REVENUE SOLUTIONS, LLC |
| CAPE URGENT CARE | KENNETH FOTI PSYD | PRACTICESUITE WOODROW WILSON REHABILITATION CENTER |
| CAROLINA PSYCHOLOGICAL ASSOC | KRISTA BEDNARSKI-GIBBS LCSW PLC | PRAIRIE VIEW FAMILY CARE, LLC |
| CARROLL HAND THERAPY | LAKE POINTE PEDIATRIC ASSOCIATES PA | PROCARE CHIROPRACTIC CLINIC |
| CASE MANAGEMENT OF MICHIGAN INC | LINDENWALD MEDICAL ASSOCIATION INC | PS CITY MEDICAL |
| CAUDILL CHIROPRACTIC CLINIC | MANHATTAN SURGICAL EYE CARE | PS COMMUNITY EYE CENTER, PA |

| | | |
|---|---|---|
| CENTRAL ANESTHESIA MANAGEMENT SERVICES | MAXIM PEKAREV MD | PS FRIEDBERG EYE ASSOCIATES |
| CHAKRA HINA AZMAT MD PA | MEDPOINT CLAIM MANAGEMENT | PS HEALTHCELL LLC |
| CHAKRA JOYFUL HEART FAMILY HEALTH CENTER | MERCY DMG | PS MEDCAL |
| CHAKRA MEDALLE MD PA | MERIDIAN SURGERY CENTER | PS PRECISION PRACTICE MANAGEMENT |
| CHAKRA POWERS PEDIATRICS | MICHELLE DROZDA | PS SCHEIN ERNST EYE ASSOC PC |
| CHAKRA VALDOSTA MEDICAL ASSOCIATES | MICKEY D MORGAN MD | PS STARK BILLING SERVICES LLC |
| CHIRO PARTNERS-RICHARD C ARMSTRONG | MIDWESTERN INSTITUTE OF HEALTH | RAYMOND L OWEN MD PA |
| CLARKANDASSOCIATES | MILFORD MEDICAL CARE CENTER | RBN BILLING SERVICE |
| CLEVELAND OPTICAL DISPENSARY | MORGAN METHOD, PLLC | REAGAN L CROSSNOE MD |
| CODY SCHARF DC | MORGAN-WHITE ADMINISTRATORS, INC. | RELIABLE ELECTRONIC MEDICAL BILLING SERVICE |
| CONNECTICUT DIAGNOSTIC SOLUTIONS, INC | NORTH GEORGIA PHYSICAL THERAPY | RELIABLE NURSES |
| CONSULTING AND COUNSEL | NORTHSIDE CHIROPRACTIC CENTER LLC | RICHARD A SPEEDLIN MD |
| COUNSELING & SUPERVISION SERVICES | OKLAHOMA NEPHROLOGY ASSOC | RICHARD S HALL MD |
| CREDENCE RESOURCE MANAGEMENT, LLC | OMBH BILLING SERVICE | RITTENHOUSE EYE ASSOCIATES |
| DANIEL J MAYER MD INC | OPTIMAL LIFE CHIROPRACTIC LLC | ROBERT K NOVICH MD |
| DAVLONG ACT PSYCHIATRIC GENETICS CENTER PA | ORCHESTRATEHR | ROBERTA L. FENNING D.O. P.C. |
| DAVLONG BAPTIST EYE SURGEONS | ORION HEALTHCARE TECHNOLOGY | ROCKVILLE EYE ASSOCIAES, P.C. |
| DAVLONG BAY AREA COMMUNITY MEDICINE | ORTHO SPORTS INC | SCHEDULE VIEWER LLC |
| DAVLONG BLADEN | OUTSOURCE INC | SHANE D BASHLINE INC |
| DAVLONG CAROLINA SURGICAL SPECIALISTS PA | P.B.R.S., INC | SOFTWARE UNLIMITED, INC |
| DAVLONG CAROLINAS CENTER FOR SIGHT PC | PFS (MAIN ACCOUNT) | SOUTHWEST DERMATOPATHOLOGY CONS |
| DAVLONG COMMUNITY EYE CENTER | PFS ATTILA BALOGH | SPECTRUM PSYCHOLOGICAL ASSOCIATES |
| DAVLONG ENRIQUE C ALMAGUER MD | PFS CHANDRAKANT M JOSHI MD | SPOONER AREA SCHOOL DISTRICT |
| DAVLONG FRIEDBERG EYE ASSOCIATES | PFS EMERGENCY AND CRITICAL CARE SERVICES LLC | SPRINGFIELD PODIATRY LLC |
| DAVLONG HEIGHTS EYE CENTER | PFS MILDRED A WALKER CNS | SPUHLER MEDICAL ASSOCIATES PA |
| DAVLONG HOPE CLINIC | PFS NEUROLOGY AND HEADACHE CTR INC | STILL WATERS COUNSELING INC |
| DAVLONG INDEPENDENT PRACTICE MANAGEMENT | PFS SHAH MEDICAL GROUP APMC | STILLWELL CHRISTIAN COUNSELING |
| DAVLONG JOHN NIELSON | PFS THOMAS E KINSTREY | STILLWELL OPTICAL |
| DAVLONG LEO EDWARDS JR | PR ADEPT PHYSICAL THERAPY FOR WOUND HEALING INC | SUNTREE INTERNAL MEDICINE INC |
| DAVLONG MARY MARGARET ONEILL | PR AGES AND STAGES PLLC | SW ENT OF FORT BEND |
| DAVLONG MILESTONE MEDOGUN | PR AMY DORE DPT | SYMMETRY COUNSELING LLC |
| DAVLONG MILLSBORO EYE CARE | PR AQUATIC PHYSICAL THERAPY | TECH TSI CORP |
| DAVLONG NADER G GARY | PR BLACK DIAMOND SPORTS THERAPY | THE EAGLES NEST HOLISTIC MENTAL |
| DAVLONG PRAXIS MEDICAL MGMT | PR BODYCARE LIPOSCULPTURE AND ANTI AGING CLINIC | TIMOTHY W GUTHMAN |
| DAVLONG PREMIER OBGYN W HOUSTON | PR CENTER PED THERAPY-FAIRFIELD | TURNING POINT RECOVERY CENTER |

| | | |
|---|---|---|
| DAVLONG SAVANNAH DIAGNOSTICS | PR CENTER PED THERAPY-WALLINGFORD | UROLOGY PARTNERS OF WESTERN KY |
| DAVLONG SCHEIN ERNST EYE ASSOC PC | PR CHOICE REHABILITATION SERVICES INC | VALLEY RETINA INSTITUTE |
| DAVLONG TERRY L SWEZEY MD PA | PR CONIFER PHYSICAL THERAPY | VERTIGA BARRI HOFFMAN FNP PLLC |
| DAVLONG VERONIQUE JOTTERAND MD A MEDICAL CO | PR CRESTVIEW PHYSICAL THERAPY | VERTIGA CORTEZ FOOT |
| DAVLONG VICTORIA A GENSEMER DPM PA | PR CROSS GATES PHYSICAL THERAPY | VERTIGA EXCELL REHAB 1 |
| DAVLONG WEINSTEIN | PR EMILY JETER | VERTIGA HERNANDEZ MD |
| DENTON HEARING HEALTH CARE | PR FARRELL PT | VERTIGA KENNETH L FRANK DPM |
| DERM BILL | PR FOXX & ASSOCIATES PHYSICAL THERAPY | PR GENTILE OT HAND CLINIC INC |
| BACK BY DESIGN, PLLC | LINDA COFFEY MD PA | VICKI MCCLOSKEY PSYD |
| WENDY CHABON LCSW | WEST LOOP CHIROPRACTIC | WEST SUNSET PEDIATRICS |
| | | WILLIAM M GEE MD PC |

# Schedule 1.1(v)

## Employees

1. CANADIAN EDI EMPLOYEES

Michael Cobban

Emily Guo

Christopher Hoeben

Nish Sampath

2. U.S. EMPLOYEES

Kyla Fisher

Divya Methukumalli

Anna Mendoza

Mark Lierow

Chuck Patten

**Schedule 1.1(dd)**

**Fixed Assets**

1. **BILLING**

| User | Location | Department | Type | Make | Model | Serial Number |
|---|---|---|---|---|---|---|
| Kyla Fisher | Remote | RCM - US | Computer | Dell | E6420 | 5Q578S1 |

2. **CLEARINGHOUSE**

| User | Location | Department | Type | Make | Model | Serial Number |
|---|---|---|---|---|---|---|
| Anna Mendoza | San Antonio, TX | RCM - US | Computer | Dell | E6440 | DZFVTZ1 |
| Anna Mendoza | San Antonio, TX | RCM - US | Monitor | Asus | VS239H | E6LMTF100922 |
| Anna Mendoza | San Antonio, TX | RCM - US | Monitor | Asus | VS239H | E3LMTF022693 |
| Anna Mendoza | San Antonio, TX | RCm-US | Monitor | Acer | Q236HL | 40403113224 |
| Anna Mendoza | San Antonio, TX | RCM - US | Printer | Dell | B1265DFW | H62V6X1 |
| Divya Methukumalli | Remote | RCM - US | Computer | Dell | E5440 | J09SM12 |
| Divya Methukumalli | Remote | RCM - US | Monitor | Dell | E2314H | CN-07R1K3-74445-491-AF7L |
| Divya Methukumalli | Remote | RCM - US | Monitor | Dell | E2314H | CN-07R1K3-74445-491-AF6L |
| Mark Lierow | Remote | RCM - US | Computer | Dell | Optiplex 9020 | 13QSL02 |
| Mark Lierow | Remote | RCM - US | Computer | Dell | E6440 | DMYPL12 |

3. **HEALTHCARE EDI**

| User | Location | Department | Type | Make | Serial Number |
|---|---|---|---|---|---|
| Chuck Patten | Remote | RCM - US | Computer | Dell E6420 | 4TD17R1 |

4. MANAGEMENT

None.

5. TIME WARNER DATACENTRE

If there is any property or assets owned by Softcare Solutions Inc. at the Closing Date that is located in the Time Warner Datacentre, located at 340 Cumberland Avenue, Portland, ME 04101, United States of America, then such property or assets would also be Fixed Assets.

## Schedule 1.1(xx)

## Software

### 1. CLEARINGHOUSE SOFTWARE

**ClaimsPlus/iPlexus Clearinghouse**

The SoftCare ClaimsPlus Clearinghouse is a cloud based, EHNAC certified application which is developed on a .Net platform and is capable of processing claim submission and ERA transactions (837/835), Eligibility transactions (270/271) and Claim Status transactions (276/277). The system processes non-standard inbound client document formats including EDI, CSV, XML and legacy formats such as NSF and Print image and produces HIPAA compliant EDI transactions from these. The Clearinghouse also has a custom built accounting, helpdesk and administrative application toolkit used by internal Support staff.

The Clearinghouse's Primary site is hosted from a HIPAA HITECH compliant Dell Cloud Datacenter located in Plano, TX. A second Dell private cloud environment located 900 miles away in Florence, Kentucky is used for offsite backup.

### 2. EDI SOFTWARE

TradeLink (B2B) Integration Gateway (current version 4.9.21)

The TradeLink B2B Integration Gateway facilitates the movement, validation, integration and audit of business documents between an organization and its trading community. It manages the various elements of the B2B document Life Cycle, including:

Trading Partner Management

Managed File Transfer (MFT)

Transformation/Integration Management

EDI / XML Translation / Validation

Business Process / Alert Management

Centralized Audit, Control and Integration Management

The TradeLink application is a three-tiered distributed and multi-threaded web application based on MVC (Model View Controller) model. With the exception of a few components (BASIS and VLTrader), almost all technologies used in TradeLink are OpenSource:

Application Server: Apache Tomcat (6, 7)

Language: Java, JavaScript, JSP

Web Technologies: SOAP/WSDL, REST, XSLT

EDI Processing Engine: BASIS

RDBMS: SQL Server, Postgres, Oracle, MySQL

# Schedule 1.1(bbb)

# Trademarks

1. SUMMARY OF SOFTCARE TRADE-MARK STATUS

| Country | Application No. | Filing Date | Status |
|---|---|---|---|
| Canada | 1,671,182 | April 3, 2014 | Application has been examined - response to Examiner's Report due November 5, 2015 |
| United States | 86406517 | September 25, 2014 (priority filing date: April 3, 2014) | Application has been examined – response to Office Action due July 16, 2015. Response filed July 6, 2015. |

2. TRADE-MARK: SOFTCARE - CANADA

- April 3, 2014 Clark Wilson files trade-mark application for SOFTCARE with the Canadian Intellectual Property Office.

- Canadian Intellectual Property Office issues Examiner's Report November 5, 2014. The Examiner objects to registration of the SOFTCARE application based on confusion with the registered mark SOFTCARE (Registration No. TMA518,128) (the "**Conflicting Mark**") owned by Organization and Systems Development Inc. The registration for the Conflicting Mark was due for renewal November 5, 2014. The registration was not renewed and the registration for the Conflicting Mark was expunged on June 6, 2015 and can no longer block the client's application for SOFTCARE.

- May 1, 2015 Clark Wilson submits request for extension of time to respond to the Examiner's Report.

- May 15, 2015 Canadian Intellectual Property Office correspondence confirms granting of extension of time to respond to the Examiner's Report. A Response to the Examiner's Report still needs to be filed by November 5, 2015, informing the Examiner that the registration for the Conflicting Mark has been expunged and requesting that the objection be withdrawn.

3. TRADE-MARK: SOFTCARE – UNITED STATES

- September 25, 2014 U.S. trademark application for SOFTCARE filed by U.S. firm Christie Parker.

- February 19, 2015 Baker Donelson (lawyers for Life Care Centers of America, Inc) issues cease and desist letter to QHR Technologies Inc., alleging infringement of U.S. Trademark Registrations for SOFCARE2 (Registration No. 4212626) and SOFCARE2 and Design (Registration No. 4212627) owned by Life Care Centers of America, Inc. (The cease and desist letter was not received by client until March 6, 2015.).

- March 23, 2015 Christie Parker reports to Clark Wilson with respect to the Office Action issued by the US Patent and Trademark Office regarding the U.S. trademark application for SOFTCARE. The Examining Attorney objected to registration of the mark alleging confusion with the following registered marks:

    - SOFCARE (Registration No. 4197057) owned by Syngetics Inc.; and

    - SOFCARE2 (Registration No. 4212626) and SOFCARE2 and Design (Registration No. 4212627) owned by Life Care Centers of America, Inc.

The above objection is a partial refusal and applies to the following goods and services:

> Computer software for receiving, validating electronic data interchange (EDI) and transmitting, via the internet or private networks, health insurance claims; Computer software package which permits users to transmit electronic health records via the internet or private networks; Electronic data interchange (EDI) computer software for transmission of medical EDI documents, patient information, health insurance plans and health insurance claims; and

> Software as a service (SAAS) provider in the field of health care services.

The Examining Attorney has advised that registration is not barred with respect to the remaining services claimed in the application, namely:

> Electronic data interchange (EDI) services, namely the structured transmission of EDI documents between computers with wired and wireless access and between health care providers, namely, physicians, hospitals, the pharmaceutical profession, health insurance plan administrators and health insurance plan brokers.

That said, the Examining Attorney also requested amendment to the description of services, and that a copy of the registration to issue from the corresponding Canadian trade-mark application for SOFTCARE be filed with the US Patent and Trademark Office.

The <u>non-extendible</u> deadline to respond to the Office Action is July 16, 2015.

- May 11, 2015 Christie Parker issues counter Cease and Desist letter to Baker Donelson, demanding that Life Care Centers of America, Inc. abandon its two trademark registrations for SOFCARE2 and terminate its use of these trademarks.

- June 24, 2015 Christie Parker and Baker Donelson discuss issues and various offers by Life Care Centers of America, Inc. for resolving matters.

- June 24, 2015 Christie Parker provides client with various options and actions to be taken with respect to Life Care Centers of America, Inc. and its SOFCARE2 registrations for consideration.

- July 6, 2015 Christie Parker files response with the Commissioner for Trademarks, amending Application serial no. 86406517 (SOFTCARE)

4. TRADEMARK – I-PLEXUS

There are no pending trademark applications or registrations for the mark i-Plexus in Canada or the United States.

Common law mark:

DOMAIN NAMES

| Domain Name | Registrant | Renewal Deadline |
|---|---|---|
| Softcare.com | Softcare EC Solutions Inc. | January 11, 2019 |
| Softcare.org | Softcare EC Inc. | September 14, 2016 |
| iplexus.net | Registrant information under privacy registration* | January 6, 2017 |
| i-plexus.net | Registrant information under privacy registration* | June 2, 2016 |
| i-plexus.com | Registrant information under privacy registration* | June 20, 2016 |

*Note: Softcare Solutions Inc. has engaged Perfect Privacy, LLC to hold this domain on its behalf.

# Exhibit C

# ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS AGREEMENT** is dated July 10, 2015.

**BETWEEN:**

**MEDICAL TRANSCRIPTION BILLING, CORP.**, a company formed under the Laws of Delaware, having an office at [redacted]

(the "**Purchaser**")

**AND:**

**SOFTCARE SOLUTIONS INC.**, a company incorporated under the Laws of Nevada, having an office c/o QHR Technologies Inc. at [redacted]

(the "**Vendor**")

**WHEREAS:**

A. The Vendor and the Purchaser are parties to an asset purchase agreement dated July 10, 2015 (the "**Purchase Agreement**").

B. Under the Purchase Agreement, the Vendor agreed to sell to the Purchaser, and the Purchaser agreed to purchase from the Vendor, the Purchased Assets, on the terms and subject to the conditions set out in the Purchase Agreement.

C. The Vendor wishes to assign all of its rights, duties, obligations and liabilities under the Assumed Liabilities to the Purchaser and the Purchaser has agreed to assume all of the Assumed Liabilities, and for the avoidance of doubt such Assumed Liabilities include the Assumed Contracts as set out in Schedule A to this Agreement.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Vendor and the Purchaser agree as follows:

1. **Rules of Interpretation**

(a) Capitalized terms used but not otherwise defined in this Agreement will have the meanings given to them in the Purchase Agreement.

(b) The division of this Agreement into sections and other subdivisions and the inclusion of headings are provided for convenience only and do not affect the construction or interpretation of this Agreement.

(c) The words "include" or "including" mean "include (or including) without limitation" and the words following "include" or "including" are not to be considered an exhaustive list.

2. **Assignment and Assumption**

Effective as, at and from the Closing Time, the Vendor hereby assigns and transfers to the Purchaser all of its rights, duties, obligations and liabilities under the Assumed Liabilities, and the Purchaser hereby accepts that assignment and transfer, and the Purchaser assumes all the rights, duties, obligations and liabilities of the Vendor under the Assumed Liabilities.

3. **Further Assurances**

Each party shall execute, acknowledge and deliver or cause to be executed, acknowledged and delivered all further acts, documents and instruments as may be reasonably necessary or desirable in order to give full effect to this Agreement or any provision of it.

4. **Relationship to Purchase Agreement**

This Agreement is entered into under the Purchase Agreement and is not in derogation of any of the rights or obligations that the parties have under the Purchase Agreement. If there is any conflict or inconsistency between the provisions of this Agreement and those in the Purchase Agreement, the provisions of the Purchase Agreement will govern.

5. **Governing Law**

This Agreement will be construed, interpreted and enforced in accordance with the laws of the Province of British Columbia and the federal laws of Canada applicable therein.

6. **Successors and Assigns**

This Agreement will enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

7. **Execution in Counterparts and Delivery by Facsimile**

This Agreement may be executed in any number of counterparts (including counterparts by facsimile), each of which will be deemed to be an original and all of which, taken together, will be deemed to constitute one and the same instrument. Delivery by facsimile or by electronic transmission of an executed counterpart of this Agreement is as effective as delivery of a manually executed counterpart of this Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF** this Agreement has been executed by the parties hereto as of the date first written above.

**MEDICAL TRANSCRIPTION BILLING, CORP.**

Per: ______________________

Name: Stephen H. Snyder

Title: President

**SOFTCARE SOLUTIONS INC.**

Per: ______________________

Name:

Title:

Signature Page – Assignment and Assumption Agreement

IN WITNESS WHEREOF this Agreement has been executed by the parties hereto as of the date first written above.

MEDICAL TRANSCRIPTION BILLING, CORP.

Per: ______________________

Name:
Title:

SOFTCARE SOLUTIONS INC.

Per: ______________________

Name: Jerry Diener
Title: President

Signature Page – Assignment and Assumption Agreement

## SCHEDULE A
## ASSUMED CONTRACTS

1. Clients

(a) Billing Services

(i) Written agreement provided to Purchaser prior to the Closing Date as part of due diligence process

MOORE EYE INSTITUTE

(ii) Other

None.

(b) EDI

(i) Written agr urchaser prior to the Closing Date as part of due diligen

# Exhibit D

**From:** Bill Korn
**Sent:** Wednesday, August 5, 2015 12:42 PM
**To:** len.ginsburg@mooreeye.com; art.geary@mooreeye.com
**Cc:** Nish Sampath; Stephen Snyder; MUNEEB MUFTI; MUHAMMAD USMAN
**Subject:** RE: Invoice for medical billing services
**Attachments:** IBS0012 July15 Invoice.pdf

Dear Dr. Ginsburg and Mr. Geary:

Attached please find Moore Eye's medical billing services invoice for the month of July 2015, which, together with the carried forward balance, totals $372,559.49.

In reviewing your original contract with i-Plexus (which has been assumed by MTBC), I realized that you provided a credit card number and authorized i-Plexus to charge your card monthly.

Unless I hear from you by the end of the week, we will charge your card for the collections in June.

We look forward to the resolving the past due balance in the near future and the privilege of continuing to partner with your practice.

Thank you.

Bill Korn
Chief Financial Officer
MTBC | *A Unique Healthcare IT Company®*
7 Clyde Road | Somerset, NJ 08873
P: 732-873-5133 x. 133 | M: 732-687-5132
www.mtbc.com | bkorn@mtbc.com

ONC-ACB Certified EHR 2014 Edition | Deloitte® Technology Fast 500 | SureScripts® Solution Provider | Microsoft® Certified Partner | Inc. 500|5000®

General Notice: The information contained in this e-mail message is confidential and intended only for the personal and confidential use of the designated recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you have received this document in error, and any review, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by email or telephone and delete the original message in its entirety. MTBC, the stylized MTBC logo, A Unique Healthcare IT Company and other MTBC logos, product and service names are trademarks of MTBC.

---

**From:** Bill Korn
**Sent:** Friday, July 24, 2015 12:30 PM
**To:** 'len.ginsburg@mooreeye.com'; 'art.geary@mooreeye.com'
**Cc:** 'Nish Sampath'; Stephen Snyder; Muneeb Mufti; Muhammad Usman (muhammadusman1@MTBC.COM)
**Subject:** Invoice for medical billing services

Dear Dr. Ginsburg and Mr. Geary:



Attached please find Moore Eye's medical billing services invoice for the months of May and June 2015, which, together with the carried forward balance, totals $338,177.36.

Please note that payment should be remitted to "MTBC" at the following address, and kindly accept our thank you in advance for promptly resolving this outstanding balance:

MTBC
7 Clyde Road
Somerset, NJ 08873

We look forward to the privilege of continuing to partner with your practice.

Best regards,

**Bill Korn**
Chief Financial Officer
MTBC | *A Unique Healthcare IT Company®*
7 Clyde Road | Somerset, NJ 08873
P: 732-873-5133 x. 133 | M: 732-687-5132
www.mtbc.com | bkorn@mtbc.com

ONC-ACB Certified EHR 2014 Edition | Deloitte® Technology Fast 500 | SureScripts® Solution Provider | Microsoft® Certified Partner | Inc. 500|5000®

General Notice: The information contained in this e-mail message is confidential and intended only for the personal and confidential use of the designated recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you have received this document in error, and any review, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by email or telephone and delete the original message in its entirety. MTBC, the stylized MTBC logo, A Unique Healthcare IT Company and other MTBC logos, product and service names are trademarks of MTBC.

 

# Billing Services Invoice

Date: 07/31/2015 | Invoice # IBS0012-10715

Please remit payment to:
MTBC
7 CLYDE ROAD
SOMERSET, NJ 08873

Bill To

IBS-Moore Eye Institute
Attn: Christine Aaaron
1000 West Sproul Road
Springfield,PA 19064

Terms: Due on receipt

| Item | Collections / Units | Description | Rate | Amount |
|---|---|---|---|---|
| | | Previous outstanding balance | | $338,177.36 |
| Medical Billing | $1,005,325.57 | Net collections for the month of July 2015 | 3.42% | $34,382.13 |
| | | Total Due | | $372,559.49 |

IF YOU HAVE QUESTIONS, PLEASE CONTACT 732-873-5133.
PLEASE DISREGARD THIS INVOICE IF YOUR PAYMENT HAS ALREADY BEEN MADE.

## CPT Activity By Provider/Location

MDoffice Reports

Selection: Corporation: All; Provider: All; Rendering Provider: All; Office: All; Facility: All; CPT Code: All; CPT Category: All; Report Type:Charges By Service,Payments By Entered Date From: 7/1/15 To: 7/31/15

Run Date: 8/5/15 10:09 am Pag 23

| CPT | Description | Units | Charge | Payment | Adjustment | Writeoff | Balance |
|---|---|---|---|---|---|---|---|

Summary By Location

| | | Units | Charge | Payment | Adjustment | Writeoff | Balance |
|---|---|---|---|---|---|---|---|
| Location Totals: | Abton | 205 | 101,813.69 | 36,577.28 | 1,244.63 | 42,635.74 | 83,354.87 |
| Location Totals: | Ext | 685 | 333,966.70 | 118,117.83 | 7,402.39 | 260,302.45 | 157,541.32 |
| Location Totals: | HRVL | 56 | 29,178.50 | 12,576.01 | 0.01 | 17,317.91 | 29,178.50 |
| Location Totals: | Laspl | 2 | 3,998.00 | 4,887.81 | 498.00 | -948.01 | 0.00 |
| Location Totals: | Mec | 1 | 0.74 | 0.74 | 0.00 | 0.00 | 0.00 |
| Location Totals: | NJ | 95 | 54,809.50 | 3,215.00 | 0.00 | 7,442.58 | 17,139.47 |
| Location Totals: | Phx | 772 | 403,749.08 | 160,803.55 | 5,954.87 | 318,623.69 | 252,797.66 |
| Location Totals: | Sph | 104,323 | 2,352,500.70 | 782,627.53 | 103,134.64 | 1,437,828.99 | 1,498,990.86 |
| Location Totals: | Sphil | 83 | 37,306.99 | 11,053.89 | 51.05 | 19,887.00 | 23,728.41 |
| Location Totals: | Suite 2 | 2 | 3,349.50 | | | | 192.77 |
| Grand Totals: | | 106,224 | 3,320,673.40 | 1,129,859.64 | 118,285.59 | 2,103,090.35 | 2,062,923.86 |

Transaction Journal - By Location - Payments Posted Date-7/1/15-7/31/15

MDoffice Reports

Selection: Corporation: All; Provider: All; Location: All; Staff: NOT - BL, DC, JW, KF, LOS, MB2, NK, RC, WS; Rendering Provider: All; Processed EMR Claim By Staff: All;

8/5/15 10:06AM Page 126

Transaction Distribution Summary

Distribution by Location

| Location | Charges | Payments | Adjustments | Writeoff |
|---|---|---|---|---|
| Abton | 4,180.00 | 1,193.94 | 501.14 | 327.30 |
| Ext | 230,645.40 | 8,691.45 | 5,043.86 | 9,507.27 |
| HRVL | 29,178.50 | 836.59 | 0.00 | 0.00 |
| Lasol | 3,998.00 | 2,948.01 | 498.00 | (948.01) |
| NJ | 57,334.00 | 925.26 | 0.00 | 1,754.20 |
| Phx | 290,834.61 | 12,668.21 | 4,588.05 | 16,971.52 |
| Sch | 806,216.56 | 95,013.61 | 65,215.56 | 109,890.14 |
| Schil | 1,158.32 | 2,256.98 | 0.00 | 3,078.79 |
| Suite 2 | 3,349.50 | 0.00 | 0.00 | 0.00 |
| Totals: | 1,426,894.89 | 124,534.07 | 75,846.61 | 140,581.21 |

Distribution by Provider

| Provider | Charges | Payments | Adjustments | Writeoff |
|---|---|---|---|---|
| 2RP | 921,655.31 | 32,379.04 | 36,316.60 | 24,841.61 |
| CA | 18,907.12 | 1,192.44 | 528.50 | 6,735.25 |
| DVR | 3,299.88 | 55.85 | 4,192.08 | 0.00 |
| GC | 0.00 | 213.03 | 0.00 | 371.14 |
| KH | 470.75 | 326.69 | 222.94 | 1,165.70 |
| LHG | 27,037.23 | 47,332.08 | 11,973.41 | 41,238.96 |
| NB | 10,092.40 | 14,521.02 | 15,229.94 | 17,963.32 |
| NWC | 26,376.00 | 8,781.98 | 2,013.10 | 26,567.62 |
| RB | 0.00 | 286.79 | 0.00 | 0.00 |
| RP | 419,056.20 | 19,445.15 | 5,370.04 | 21,697.61 |
| Totals: | 1,426,894.89 | 124,534.07 | 75,846.61 | 140,581.21 |

# Exhibit E



Samantha E. Hirsch
Tel 215.988.7800
Fax 215.988.7801
hirschs@gtlaw.com

August 20, 2015

**VIA CERTIFIED MAIL –RETURN RECEIPT**

Nish Sampeth
SoftCare Solutions, Inc.
8601 Village Drive, Suite 204
San Antonio, TX 78217

Re: *Moore Eye Care, P.C. and Eye Services, MSO d/b/a Moore Eye Institute v. SoftCare Solutions, Inc., QHR Technologies, Inc., Medical Transcription Billing, Corp. and William Dagher*, County Court of Common Pleas of Delaware County, No. 2015-7127

Dear Mr. Sampeth:

Pursuant to the Pennsylvania Rules of Civil Procedure, I am hereby serving you with a Complaint filed in the Court of Common Pleas of Delaware County, Pennsylvania.

Sincerely yours,

Samantha E. Hirsch

Enclosure

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MEXICO CITY+
MIAMI
MILAN**
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PALM BEACH COUNTY
PHILADELPHIA
PHOENIX
ROME**
SACRAMENTO
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TEL AVIV^
TYSONS CORNER
WARSAW~
WASHINGTON, D.C.
WHITE PLAINS

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

Delaware County

For Prothonotary Use Only:

Docket No: 2015-7127

FILED 2015 AUG 14 AM 11:45 JUDICIAL SUPPORT OFFICE DELAWARE COUNTY PA

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

SECTION A

**Commencement of Action:**

- [X] Complaint
- [ ] Writ of Summons
- [ ] Petition
- [ ] Transfer from Another Jurisdiction
- [ ] Declaration of Taking

Lead Plaintiff's Name: Moore Eye Care, P.C.

Lead Defendant's Name: Softcare Solutions, Inc.

**Are money damages requested?** [X] Yes [ ] No

Dollar Amount Requested (check one): [ ] within arbitration limits [X] outside arbitration limits

**Is this a *Class Action Suit?*** [ ] Yes [X] No

**Is this an *MDJ Appeal?*** [ ] Yes [X] No

Name of Plaintiff/Appellant's Attorney: Robert M. Goldich

[ ] **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

SECTION B

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your ***PRIMARY CASE.*** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [ ] Product Liability *(does not include mass tort)*
- [ ] Slander/Libel/ Defamation
- [ ] Other:

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other:

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional:

**CONTRACT** *(do not include Judgments)*
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other
- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other
- [X] Other: Insurance Contract and Other Contracts

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other:

**CIVIL APPEALS**

Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other
- [ ] Zoning Board
- [ ] Other:

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other:

*Updated 1/1/2011*

IN THE COURT OF COMMON PLEAS
OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL DIVISION

MOORE EYE CARE, P.C. and
EYE SERVICES, MSO d/b/a MOORE
EYE INSTITUTE

Plaintiff

Case No.:

v.
SOFTCARE SOLUTIONS, INC., QHR TECHNOLOGIES, INC.,
MEDICAL TRANSCRIPTION BILLING, CORP., and WILLIAM DAGHER

Defendant

**NOTICE TO DEFEND**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by and attorney and filing in writing wit the court your defenses or objections to the claims set fort against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyers' Referral Service
Front and Lemon Streets
Media, PA 19063
(610) 566-6625

**GREENBERG TRAURIG, LLP**
By: Robert M. Goldich (I.D. No. 25559)
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel: 215.988.7883
Fax: 215.717.5242
goldichr@gtlaw.com

***Attorneys for Plaintiffs Moore Eye Care, P.C. and Eye Services MSO, d/b/a Moore Eye Institute***

FILED 2015 AUG 14 AM 11: OFFICE OF JUDICIAL SUPPORT DELAWARE CO. PA.

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| MOORE EYE CARE, P.C. and EYE SERVICES, MSO d/b/a MOORE EYE INSTITUTE, | : | **COMPLAINT** |
| Plaintiffs | : | Civil Action No. ___________ |
| vs. | : | |
| SOFTCARE SOLUTIONS, INC., QHR TECHNOLOGIES, INC., MEDICAL TRANSCRIPTION BILLING, CORP., and WILLIAM DAGHER, | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

**INTRODUCTORY STATEMENT**

1. The economic viability of any medical practice is dependent on timely billing and collection of services rendered by its physicians. Defendants materially misrepresented their capability to perform these services for Plaintiffs and breached their obligations to provide them, causing Plaintiffs to suffer substantial financial losses. Plaintiffs bring this action to recover these damages.

**PARTIES, JURISDICTION AND VENUE**

2. Plaintiff Moore Eye Care, P.C. is a Pennsylvania Professional Corporation with its principal place of business in Delaware County, Pennsylvania.

3. Plaintiff Eye Services, MSO ("Eye Services") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. Plaintiffs together do business as the Moore Eye Institute and shall be referred to as "Moore Eye" or "the Practice."

4. Defendant SoftCare Solutions, Inc. (formerly i-Plexus Solutions, Inc.) ("i-Plexus") is a corporation organized and existing under the laws of the State of Florida, with an address of 8601 Village Drive, Suite 204, San Antonio, Texas 78217.

5. Defendant QHR Technologies, Inc. ("QHR") is a corporation organized and existing under the laws of British Columbia, Canada, with an address of 1620 Dickson Ave, Kelowna, BC V1Y 9X1, Canada.

6. Defendant William Dagher ("Dagher") is an individual citizen of the State of Georgia, with an address of 925 Gunter Court, Alpharetta, Georgia 30022.

7. Defendant Medical Transcription Billing, Corp. ("MTBC") is a corporation organized and existing under the laws of the State of Delaware, with an address of 7 Clyde Road, Somerset, NJ 08873.

8. Each of the defendants conducted business with Plaintiffs in this County, and each is subject to the jurisdiction of this Court.

9. This Court is the proper venue for this action.

**STATEMENT OF FACTS**

10. Plaintiff Moore Eye Care, P.C. is a multi-office Practice providing medical and surgical services to patients in the specialty of ophthalmology.

11. Moore Eye Care, P.C. was founded by Dr. Leonard Ginsburg, who is presently the sole shareholder in the Practice. Plaintiff Eye Services was incorporated to provide support services as a Medical Services Organization to Moore Eye Care, P.C.

12. The Practice employs numerous physicians who perform a broad range of medical services at office locations in Delaware, Chester, Montgomery and Philadelphia Counties.

13. The Practice and physicians are participating providers and have entered into contracts with the Center for Medicare and Medicaid Services ("CMS") and with commercial insurance carriers to provide professional medical services to their beneficiaries and insureds for which they remit payment to the Practice pursuant to the terms of the contract and their fee schedule. In addition, a large number of insured patients have co-payment or self-payment obligations in connection with their insurance coverage. Medicare and the commercial insurance carriers are referred to in this Complaint as a "Payor" or "Payors."

14. Each Payor has its own requirements for the billing and payment of professional medical services.

15. Billing of medical services is highly regulated and subject to scrutiny by the United States government and Payors to assure that all claims for payment are proper and appropriate.

16. As a result of the regulatory framework, the patient billing process is complex and has many steps.

17. At the first step of the process, the treating physician is responsible for properly recording information regarding the services provided to the patient in the patient's medical record. This information is the basis for the proper coding of the patient's diagnosis and procedures performed, which may be also recorded on a "superbill".

18. Physicians are busy and focused on providing medical care. Physicians must therefore rely upon non-medical personnel (either employees of the medical practice or third parties engaged for this purpose, such as a billing company) to review the superbills for accuracy

and notify the Physician of the need to correct any mistakes or provide additional information before the "claims" are submitted for payment.

19. Once the information related to the patient and services provided are finalized and entered into the computer, the claims are then sent to a clearinghouse for a review.

20. The role of a clearinghouse is to "scrub" the claim to assure that the services are properly coded and that they meet all of the Payor requirements for submission to the Payor. If a clearinghouse determines that a claim contains errors or is missing information, the clearinghouse will reject the claim. The claim should be either returned to the practice for review and correction or returned to the billing company which in turn will notify the practice.

21. Claims that are accepted by the clearinghouse are then forwarded to the Payor for payment. Upon receipt of the claim by the Claims Department of the Payor, it will conduct its own independent review of the bill and make a determination of the amount due to the practice for the services rendered in accordance with the terms of its contract with the practice and its fee schedule.

22. The Payor may reject a bill in its entirety, may issue a payment for less than the appropriate amount or may request additional information. In these circumstances, it is the responsibility of the billing company to determine if the payment is made in accordance with the Payor's fee schedule, identify the reasons for any non-payment or reduced payment and to notify the practice of any such problems so that the claim can be re-submitted and paid correctly.

23. Under the applicable federal regulations (Medicare) or Payor requirements, a medical practice has a limited amount of time after providing services to initially submit the claim to the Payor for payment, or to submit the claim with all deficiencies or corrected or to appeal any denial of payment or offset against future claims by the Payor.

24.     Even if all steps in the billing process have been correctly followed, there may be delays in payment.  In order to avoid excessive accumulation of accounts receivable, the billing company for any medical practice must be vigilant in pursuing collection of amounts due to the practice both from Payors and patients themselves.

25.     Because of the success of its practice, Moore Eye has traditionally been able to recruit highly talented physicians to work in the Practice.  These physicians are compensated in part based upon their productivity and collections resulting from their services.

26.     As is any medical practice, Moore Eye is reliant upon cash flow from Payor and patient billings to fund the operation of the Practice and to pay compensation to its physicians and other employees.

27.     Prior to September 2012, Moore Eye relied upon the efforts of its own staff and used a practice management company with billing software named doctor.com for billing and collection from patients and Payors.

28.     Prior to September 2012, Moore Eye engaged a separate clearinghouse not associated with defendants in connection with the billing process.

29.     The year 2012 was a critical year for the Practice.

30.     As of 2012, the Practice was contemplating conversion from manual records to an Electronic Medical Records system in order to comply with the Health Information Technology for Economic and Clinical Heath Act (the "HITECH Act").

31.     As of 2012, the Practice was also in an expansion mode, as new physicians were being hired and needed to be credentialed.

32. In August 2012, the Practice was introduced to William Dagher through a referral. Dagher represented himself as the president of i-Plexus Solutions, Inc., a Florida-based company.

33. Moore Eye informed Dagher that it was dissatisfied with its internal billing process.

34. Dagher volunteered to review the existing billing system of Moore Eye and to make recommendations for improvement without compensation.

35. Following his review, Dagher informed Moore Eye that he could substantially improve the efficiency of its billing and save the Practice substantial money by charging the Practice a percentage of collections as a fee.

36. In 2012, Dagher made a number of specific representations in order to persuade Moore Eye to engage i-Plexus to take over its billing responsibilities.

37. Dagher represented that i-Plexus had more than 12,000 providers under contract to whom i-Plexus was providing billing services.

38. Dagher represented that i-Plexus had a large staff in Florida and elsewhere in the United States that employed more than 250 employees and therefore had the capacity to take on a large practice like Moore Eye.

39. Dagher represented that i-Plexus had specific expertise in doing billing for ophthalmological practices.

40. Dagher represented that he would be able to collect accounts receivable which Moore Eye's staff had written off.

41. Dagher represented that he had access to a consultant named Theresa Saltz who worked for a sister company that he owned and who had the skill to improve the accuracy of Moore Eye's billing and coding system.

42. Dagher represented that he was prepared to take on all of the employees of Moore Eye so that all of Moore Eye's billing expenses would be included in the i-Plexus fees for the new billing system, thus saving costs to the Practice.

43. Dagher stated that over time he would migrate the Practice from its existing clearinghouse to an i-Plexus owned clearinghouse.

44. Dagher stated that the advantage of the i-Plexus clearinghouse is that it could track "claim status," build in edits (to make sure "modifiers" are used), ensure compliance with Payor billing policies, etc., begin the population of the denial management data base from the ERA (EOBs) that would come through the clearinghouse. Dagher represented that by having billing and clearinghouse services under one roof, he would be able to measure what he was managing.

45. Based upon the representations of Dagher, Moore Eye entered into an i-Plexus Contract, a true and correct copy of which is attached as Exhibit A to this Complaint and incorporated by reference.

46. It was not until later that Moore Eye discovered that each and every one of the representations made by Dagher as enumerated in paragraphs 39-46 above was materially false and that Dagher had blatantly lied to secure the Contract.

47. The Contract between Moore Eye and i-Plexus very clearly delineated the role and responsibility of Moore Eye which consisted of nine such items listed on page 2 of the Contract.

48. The roles and responsibilities of i-Plexus under the contract consisted of the 30 specific items listed on pages 2 and 3 of the Contract.

49. The Contract between Moore Eye and i-Plexus took effect on January 1, 2013.

50. In March 2013, with the full knowledge of i-Plexus, Moore Eye transitioned to Nextech Practice Management Software for the Practice's billing and scheduling records. At or about the same time, Moore Eye changed clearinghouses from its existing clearinghouse to the i-Plexus clearinghouse.

51. i-Plexus completely mismanaged the transition.

52. During the transition, i-Plexus failed to detect that Moore Eye had separate National Provider Identifier (NPI) numbers for its anterior and retina physicians, which are used by the Payors to identify the practice.

53. Because of the gross negligence of i-Plexus in mismanaging the transition, the Practice's cash collections dropped and its accounts receivable skyrocketed.

54. i-Plexus failed to properly educate itself regarding the Nextech Practice Management software, that was necessary for it to enter the services performed by the physicians into the system and then to pull this information out as claims for billing. Moore Eye later found that approximately 900 claims had never left the Nextech system to be transmitted to Payors for payment.

55. i-Plexus failed to examine accounts receivable that had been incorrectly written off while the Practice was using the doctor.com software and to collect them as Dagher had promised.

56. i-Plexus hired a billing manager, Joanne Cuomo, to work out of Moore Eye's office. Cuomo was incompetent and overwhelmed and could not properly enter services into the computer for billing.

57. i-Plexus was grossly negligent in its supervision of Cuomo.

58. Moore Eye eventually discovered that Cuomo was hiding superbills from which she was to enter the services into the computer, in drawers and cabinets instead of entering them into the computer for billing . Eventually it was discovered that there were approximately 600 superbills that could not be accounted for and needed to be recreated. Physicians of the Practice needed to take valuable time away from their professional duties to review patient medical records to determine the diagnosis and services that were provided in order to recreate the superbills. Cuomo also was hiding checks for deposit in desk drawers instead of readying them for deposit into the bank.

59. In mid-2013, the Practice received complaints from physicians regarding inadequate payment receipts. In response to the cash crisis which the Practice experienced in mid-2013, Dagher flew to Pennsylvania to meet with the Practice's physicians. Dagher assured Moore Eye and its physicians that the problems which i-Plexus was experiencing were temporary and would be promptly remedied. As with many of Dagher's promises, these representations were false.

60. In September 2013, Moore Eye discovered that the addresses needed to electronically submit claims for two of its largest commercial carriers were wrong and that claims had been denied for nine months.

61. In order to rectify the problems, Moore Eye assigned five of its staffers to collect accounts receivable to perform responsibilities that were those of i-Plexus under the Contract.

62. In November 2013, Moore Eye completed the transition to one NPI number for the Practice and updated its system so that only that one number would be used in connection with all billings.

63. i-Plexus did not properly update its system and for many months the i-Plexus clearinghouse was overriding the new NPI number used by Moore Eye.

64. The override continued until May 2014, when it was discovered that Medicare failed to remit payments to the Practice for claims submitted during the months of March, April and May.

65. i-Plexus did not perform its duty under the Contract to credential physicians in the Practice with the Payors, rendering the Practice unable to bill the Payors for their services.

66. On January 21, 2014, Dr. Ginsburg and Chief Operating Officer, Art Geary met with Dagher to review all of the billing and collection issues that were plaguing the Practice.

67. At the January 21, 2014 meeting with Dagher, Moore Eye presented a specific list of contractual responsibilities which i-Plexus was failing to adequately perform. These included:

(a) Lack of recognition of the exponential growth of outstanding accounts receivable.

(b) Failure to apply outstanding balances.

(c) Failure to pay attention to the scheduled and not billed report.

68. Dagher agreed to a specific timeline to address these issues.

69. In February 2014, Dr. Ginsburg and Geary visited the Florida location of i-Plexus and discovered that the employees of i-Plexus who were processing the Practice's bills lacked even the basic knowledge of ophthalmology needed to understand how to correctly bill for the services. Dr. Ginsburg provided an immediate tutorial to the employees of i-Plexus.

70. Shortly after the February 2014 visit of Dr. Ginsburg and Geary to Florida, Moore Eye received notification that Dagher was no longer employed by i-Plexus.

71. Michael Halligan, a Vice President of QHR, contacted Moore Eye and explained that Dagher has been terminated but that QHR would continue performing the Contract.

72. Over the next several months, i-Plexus virtually ceased any meaningful oversight of billing and collection for Moore Eye. By mid-2014, the accounts receivable of the Practice had more than doubled, and the Practice was facing financial collapse.

73. In May 2014, with advance notice to i-Plexus, Moore Eye transitioned to MDOffice Practice Management software from Nextech software. Moore Eye insisted that i-Plexus' employees be trained regarding the MDOffice software.

74. i-Plexus resisted the training request but eventually agreed to allow several employees to be trained. Shortly after the training was completed, i-Plexus terminated the employment of the individuals, leaving only one i-Plexus employee who had been trained on MDOffice.

75. On July 28, 2014, Michael Halligan of QHR came to the offices of Moore Eye.

76. Halligan admitted that i-Plexus had failed to adequately perform its responsibilities under the Contract.

77. Halligan stated that QHR was assuming responsibility for the performance of the Contract from i-Plexus, and that QHR would rectify the many issues which Moore Eye was experiencing by reason of the utter failure on the part of i-Plexus to handle billing for the Practice.

78. As a result of Halligan's assurance, Moore Eye agreed to allow QHR to continue to have responsibility for performance of the Contract.

79. On behalf of QHR, Halligan specifically agreed that he would immediately attack the excessive accounts receivable so that the Practice could survive.

80. In January 2015, Halligan approached Moore Eye on behalf of QHR to discuss the fact that Moore Eye was not paying monthly fees to either i-Plexus or QHR.

81. Halligan admitted in January 2015 that personnel of i-Plexus had acted improperly in destroying records to cover up the fact that bills had not been properly issued.

82. Halligan admitted in January 2015 that both i-Plexus and QHR lacked the necessary staff to collect accounts receivable. He agreed that Moore Eye should hire more staff to engage in collection activities.

83. Under Halligan's direction, the accounts receivable appeared to decline. However, QHR failed to disclose to Moore Eye that it was accomplishing this by not accounting for claims that had never been submitted to the Payors for payment.

84. Unknown to Moore Eye at the time, i-Plexus and QHR were sitting on a huge volume of claims which the i-Plexus clearinghouse had rejected but which were never returned to Moore Eye for correction and resubmission.

85. Had i-Plexus and QHR notified Moore Eye of these deficiencies, corrective actions could easily have been taken. However, as was true throughout the duration of the Contract, QHR and i-Plexus did not adequately staff the Moore Eye account and did not have sufficiently trained personnel to perform even the basics associated with medical billing.

86. Unknown to Moore Eye at the time, Moore Eye was losing the ability on a daily basis to ever collect on claims that were either never submitted to the Payor or which required additional information for their resubmission because the deadline mandated by the Payors for

the timely filing of claims had passed as had any appeal rights for claims which the Payors are requesting repayment.

87. In an effort to persuade Moore Eye to begin making monthly payments, Halligan presented information which he claimed demonstrated that the accounts receivable problem had been brought under control.

88. The accounts receivable information which Halligan presented was not accurate.

89. Halligan admitted on behalf of i-Plexus and QHR in January 2015 that William Dagher had misrepresented client accounts, staff knowledge and hiring practices of i-Plexus in order to secure the Contract.

90. Halligan stated in January 2015 on behalf of QHR, "I take responsibility for the Company's agreement that was signed."

91. On January 26, 2015, representatives of Moore Eye met with Halligan to discuss QHR's pledge properly perform the Contract.

92. In response to Moore Eye's presentation of the history of the relationship dating back to the initial contacts with Dagher, Halligan admitted that Moore Eye had been the victim of fraud.

93. Halligan admitted that he had spent two years trying to clean up "Dagher's mess."

94. Halligan admitted on behalf of QHR and i-Plexus that Dagher had made false promises to many customers and that as a result of those false promises, litigation had resulted.

95. In the meeting of January 26, 2015, Moore Eye brought in a former employee of the defendants, Marcy Goff, to provide documentation surrounding the defendants' efforts to cover up their utter lack of performance of their contractual obligations.

96. Ms. Goff presented evidence to Halligan that QHR and i-Plexus had taken unauthorized write-offs of accounts receivable, and that emails and data had been erased by an employee of the defendants.

97. When presented with this evidence, Halligan agreed that Moore Eye had been the victim of fraud.

98. Ms. Goff presented evidence that i-Plexus had made no efforts to collect hundreds of thousands of dollars in receivables dating back to the time when Moore Eye was using Nextech Practice Management software.

99. When presented with Ms. Goff's report, Halligan stated that QHR would immediately write off the entirety of the outstanding balances otherwise due to QHR from Moore Eye through the end of 2014 as a good faith gesture.

100. At the January 26, 2015 meeting, Halligan did not disclose to Moore Eye, nor did any representative of QHR ever disclose to Moore Eye that QHR had made a strategic business decision to exit the medical billing and clearinghouse businesses.

101. Instead of disclosing QHR's true business plan, Halligan lulled Moore Eye into believing that it was committed to bringing additional resources to resolve the ongoing issues which remained unresolved despite years of broken promises by Dagher, i-Plexus and QHR.

102. In contradiction to Halligan's promise, QHR never wrote off the Moore Eye receivable. Instead the receivable remained on the books of QHR as an asset which QHR secretly sold to MTBC without notice to Moore Eye

103. In January 2015, frustrated with the continued inability of QHR to perform its obligations, Moore Eye made a business decision to retain a highly experienced billing manager, Sharon McClennan, to assess the contractual performance of i-Plexus and QHR.

104.    It was only through the efforts of Ms. McClennan that Moore Eye was finally able to comprehend the extent of the failings of i-Plexus and QHR and the root causes of the cash flow issues which had plagued the Practice for the entire two-plus years of the parties' relationship.

105.    Ms. McClennan determined that i-Plexus and QHR were not even performing the basic services of a healthcare billing service.

106.    Ms. McClennan determined that i-Plexus and QHR were simply failing to submit clean billing batches in a timely manner to allow for insurance and patient payments.

107.    Ms. McClennan made a number of specific determinations, as enumerated in paragraphs 108-116 below.

108.    Huge amounts of charges were going unbilled each month by i-Plexus and QHR.

109.    No audit processes were in place at i-Plexus and QHR to review claims submitted and payments.

110.    There was no daily process at i-Plexus and QHR in place to enter or scrub claims.

111.    Routine insurance carrier calls were not being made by either i-Plexus or QHR to determine why electronic claims were not being processed or adjudicated.

112.    Electronic claim files were being resubmitted by i-Plexus and QHR rather than being reviewed increasing chances of audit due to duplicate billing.  Additionally, patient registration errors on claims were not being corrected in a timely manner, which led to charges being written off.

113.    Clearinghouse reports were not utilized and worked on a routine basis by i-Plexus and QHR, which resulted in countless timely filed rejections.

114.   Staff at i-Plexus and QHR lacked the appropriate skillset to work the accounts receivable.

115.   There was no month-end process at i-Plexus and QHR which resulted in unposted payments, unbilled charges, all of which skewed the final numbers and monthly reports.

116.   There was no follow up from the i-Plexus and QHR accounts receivable managers despite repeated phone calls requesting plans and strategies to resolve ongoing accounts.

117.   In April 2015, as part of its ongoing efforts to determine whether there were still outstanding bills that could be corrected and resubmitted within the legally required timeframe, Moore Eye asked QHR to provide a report from its clearinghouse of outstanding claims rejected by the clearinghouse over the last 12 months.

118.   QHR initially responded by informing Moore Eye that it only retained clearinghouse data for 90 days, and that no information before December 2014 could be provided in response to the request.

119.   After Moore Eye expressed disbelief at this answer and maintained that the clearinghouse was legally obligated to maintain records dating back for a longer period of time, QHR produced a mass of information that was unintelligible and unusable.

120.   Even at this late date, if QHR had been willing to devote the resources necessary to look at claims that had been rejected by its clearinghouse, substantial additional collections could have been obtained.  Instead, focused on the sale of the company, QHR continued to provide inadequate resources to Moore Eye to do the job, leaving it to Moore Eye staff members to perform the majority of work involved in billing and collection.

121. On or about July 14, 2015, Moore Eye received notification from defendant MTBC that it had acquired i-Plexus from QHR and that MTBC would be assuming responsibility for the Contract.

122. In response to specific questions from Moore Eye, MTBC stated that it had succeeded to all assets and liabilities associated with the Contract.

123. MTBC provided immediate assurances to Moore Eye that it would perform all contractually required obligations of i-Plexus without interruption.

124. Despite these assurances from MTBC, MTBC immediately terminated a number of employees of i-Plexus and QHR who had been working the Moore Eye account. Additionally, the i-Plexus manager of the account notified Moore Eye that she was abruptly resigning her position without notice.

125. Despite the assurances from Halligan that past amounts due to i-Plexus and QHR would be written off, MTBC has issued bills to Moore Eye for services rendered dating back to 2013.

126. After MTBC notified Moore Eye that it had assumed QHR's obligations, Moore Eye put MTBC on notice of the issues that it had with QHR and the continuing issues for which MTBC was responsible.

127. Instead of acting to address Moore Eye's issue, MTBC informed Moore Eye on Tuesday night, August 11, 2015, that it was terminating all services to Moore Eye effective August 14, 2015. MTBC subsequently abandoned all services at midnight on August 13 without providing vital information that Moore Eye had requested and needed to take over the billing process.

128. MTBC's unilateral termination of services without proper notice caused further injury to Moore Eye.

129. Individually and collectively, defendants i-Plexus, QHR and MTBC have failed to perform the roles and responsibilities of the billing company as set forth in the Contract.

130. By way of example, the Contract provides that i-Plexus would engage in the management and optimization of the Moore Eye revenue cycle, bringing it to "best practice" status.

131. As set forth above, defendants engaged in "worst practices" and utterly failed in their contractual obligations.

132. Many of the roles and responsibilities of the defendants under the Contract required daily review and correction of information, daily entry of patient charges, daily entry of patient payments, daily claims submission and daily correction of Payor submission errors. At no time did the defendants come close to meeting these responsibilities.

133. Defendants promised in the Contract to operate a call center for patient billing questions. This never happened. In fact, Defendants had no system in place to receive patient calls, and huge amounts of patient payments were never collected as a result.

134. Defendants promised in the Contract to follow up on unpaid Payor balances. This never happened.

135. Defendants promised in the Contract to develop performance indicators and to re-evaluate them on an annual basis. This never happened.

136. Defendants promised in the Contract to proactively monitor payment levels in comparison to the Moore Eye fee schedules that fees were adequate and avoid underpayments due to pricing. This never happened. In fact, on information and belief, Moore Eye's charges

for physician services are below market rates, and any "proactive" plan to increase charges would have generated substantial additional revenue for the Practice.

137. Defendants agreed in the Contract to rent space for its employees during the term of this contract. No rental payments were ever made.

138. As a result of the many breaches by the defendants of their contractual obligations, Moore Eye has suffered direct economic injuries that include but are not limited to the following specific items of loss:

(a) Inability to collect for Medicare claims that are over 365 days old and for other insurance company claims that were not timely submitted.

(b) Inability to submit claims that were rejected by the i-Plexus clearinghouse but never returned to Moore Eye for correction.

(c) Inability to collect on claims that were rejected due to missing information on J-codes on superbills which were not detected by the defendants and which now cannot be submitted due to timely filing limits.

(d) Refunds that the Practice has paid to Payors since January 1, 2013 due to the Payor's request for repayment of paid claims which the Practice could have been successfully appealed, but cannot as the deadline for filing appeal passed .

(e) Losses due to accounts receivable that were improperly written off and never collected.

(f) Internal costs incurred by Moore Eye resulting from both (i) its need to hire personnel to perform the contractual responsibilities of the defendants, and (ii) administrative and staff time devoted to managing the relationship and addressing the issues identified in this Complaint.

      (g) Failure to collect prior accounts receivable at the time that the Contract began.

(h) Huge delays in collecting accounts receivable.

139. Further discovery is required to fully quantify Plaintiff's damages, but Plaintiff expects and anticipates that when all damages are quantified, they will substantially exceed $1,000,000 during the time the Contract was in effect.

**COUNT I**
**BREACH OF CONTRACT CLAIM AGAINST DEFENDANTS SOFTCARE SOLUTIONS, INC., QHR TECHNOLOGIES, INC., AND MTBC, INC.**

140. Plaintiff incorporates by references the factual allegations contained in paragraphs 1 to 139 above.

141. Defendants SoftCare Solutions, Inc. and QHR Technologies, Inc. are jointly and severally liable for the many breaches of the Contract described above and for the economic losses resulting from the breaches of contract.

142. Defendant MTBC is both a successor to the liabilities of QHR and i-Plexus resulting from its acquisition of those liabilities as well as independently responsible for all damages suffered by Moore Eye in breach of its own contractual obligations after MTBC began performing billing responsibilities for Plaintiff.

143. MTBC is responsible for all damages suffered by Moore Eye resulting from termination of services without adequate notice.

144. The economic damages suffered by Moore Eye all resulted from gross negligence by all defendants in the performance of their contractual obligations.

145. Due to defendants' gross negligence, Moore Eye is entitled to recover damages for 100% of the negative financial impact suffered by the Practice.

**COUNT II**
**FRAUD CLAIM AGAINST DEFENDANTS QHR, i-PLEXUS AND DAGHER**

146. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 145 above.

147. Defendant Dagher secured the Contract with Moore Eye to perform services in Florida based upon intentional and material misrepresentations of fact.

148. Dagher intentionally and willfully misstated material facts relating to the size of the i-Plexus business, the number of customers, its experience in providing billing services for ophthalmological practices and its capabilities in order to secure the Contract.

149. Moore Eye reasonably relied upon Dagher's representations in signing the Contract.

150. Dagher made his material misrepresentations in his capacity as an officer and agent of Defendants i-Plexus and QHR.

151. Defendants i-Plexus and QHR are vicariously liable for all of Dagher's misrepresentation in his role as their officer and agent.

152. Defendants compounded Dagher's original fraud by lying about their efforts to remediate the fraud, covering up their misdeeds, destroying records, and falsely claiming not to have certain other records.

153. Moore Eye has suffered substantial damages, both economic and non-economic, resulting from Defendants' fraud in the inducement of Moore Eye to contract with Defendants and is entitled to full recovery of such damages.

154. Defendants' fraudulent conduct was willful, wanton and in reckless disregard of Plaintiff's rights, entitling Moore Eye to an award of punitive damages.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Moore Eye demands the entry of Judgment in favor of Plaintiff and against all Defendants providing the following relief:

1. An award of compensatory damages in an amount in excess of $100,000;

2. An award of punitive damages in an amount to be determined by the trier of fact.

3. An award of pre-judgment interest.

4. An award of reasonable attorney's fees and costs.

5. Such other and further relief as the Court may determine is reasonable and necessary to remedy the Defendant's violations of Plaintiff's rights.

Robert M. Goldich (25559)
GREENBERG TRAURIG LLP
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel. 215.988.7883
Fax 215.717.5242
goldichr@gtlaw.com

Dated: August 14, 2015

*Attorneys for Plaintiffs Moore Eye Care, P.C. and Eye Services MSO, d/b/a Moore Eye Institute*

**VERIFICATION**

Leonard Ginsburg, M.D. hereby states that I am the President of Moore Eye Care, P.C. and Eye Services, MSO d/b/a Moore Eye Institute ("Plaintiffs"), that I am authorized to provide this Verification on behalf of Plaintiffs and that the facts contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I provide this Verification subject to the penalties of 18 Pa. C. S. § 4904, relating to unsworn falsification to authorities.

Leonard Ginsburg

8/13/15

# EXHIBIT A

1

## i-Plexus Billing Solutions Contract

1. This Agreement is entered into on December 19, 2012 between i-Plexus Solutions, Inc. located at 8346 Forest Oaks Blvd, Spring Hill, FL 34606 thereafter known as "i-Plexus" Moore Eye Institute (MEI), located at 100 West Sproul Road, Suite 100 Springfield, PA 19064, thereafter known as "Customer".

2. Term & Termination This Agreement is in effect for two year and automatically renews for successive one-year terms thereafter unless either party provides 120 days written notice of termination. Either party at any time may terminate this Agreement with at least 120 days written notice. After two years, but the customer can do so after one year.
   a. In the event that the agreement is terminated by either party:
      i. i-Plexus will provide assistance in transitioning to the new billing organization (in-house function or outsourced function)
      ii. i-Plexus will receive the fee of 3.85% for those payments collected on charges that were billed prior to the transition to the new billing organization.
   b. Should MEI terminate this agreement within the first 9 months of the contract signature date, i-Plexus will be reimbursed for the NextTech software cost which is $13,250.
   c. Should MEI continue with i-Plexus for a three year period, MEI will be relieved of any responsibility to reimburse i-Plexus for cost related to the NexTech PM/EMR system. Please see Addendum B for sliding scale of payment should the agreement be terminated prior to three years from contract signature date.
   d. Should i-Plexus or MEI terminate this agreement after three years from the contract signature date, i-Plexus will return those user licenses purchased to MEI for their use at no charge.

The billing service will commence on January 1, 2013.

3. Fees: 3.85% of monthly collections. Moore Eye will not be billed for those payments collected on charges that were billed prior to the transition to i-Plexus January 1st, 2013. After one year from EMR go-live, the fee can go up if the customer is not having 90% of the charges generated from the electronic medical record charting process. However, this 90% does not apply to Dr. Leonard Ginsburg for two years from the Moore Eye EMR go-live. The fee will exclude payments for Lucentis, Eylea, and any other similar J and Q Codes that may arise in the future so long as these J-codes are properly coded and do not require chronic payer appealing. Should the level of appeals becomes (too) high, i-Plexus will notify Moore Eye in writing that percent of payment is at risk to increase. Moore Eye will have 120 days from date of notification to correct issue prior to negotiation of a mutually acceptable agreement.

4. i-Plexus will issue an invoice to Customer at the end of each month for the fees earned during that month. Customer agrees that i-Plexus will debit Customer's credit card account before the 15th of the month for services provided for the previous month.

VISA AMEX

Please Circle the Card Type Above
Provide Credit Card Number Here 3727 387596 01052
Provide Name as it appears on the card Chris Karan
Expiration Date of Credit Card: Month 11 Year 15
I agree to authorize i-Plexus to process the above credit card automatically every month for these services
Signature [signature]

5. Liability: i-Plexus's liability with respect to processing or submission of Customer's transactions shall be limited to re-processing and re-submission of such transactions at no additional charge to Customer. In all other cases, i-Plexus's liability for direct damages shall be limited to 10% of the billing during the time frame in which the damages were incurred, to the Customer. Should i-Plexus's management or staff perform in a grossly negligent manner relating to the i-Plexus's responsibilities of this contract and causes a negative financial impact to Customer, i-Plexus's



i-Plexus
Solutions

liability with respect to damages caused by said gross negligence will be 100% of the negative financial impact incurred by the Customer. Prior to these the enforcement of the damages, there will be a cure period in which I-Plexus will attempt to rectify the impact of the negligence. In no event will I-Plexus' be liable for any indirect, incidental or consequential damages. Further, in no event shall I-Plexus be liable for loss or damage resulting, directly or indirectly, in whole or in part, from any act, omission, delay, fault, insolvency, or circumstance attributable to any payer or their intermediary or clearinghouse.

Agreed and Accepted by:

I-Plexus Name and Title William Dagher President

I-Plexus Signature and Date [signature] 12-20-2012

Customer Name and Title Leonard Ginsburg CEO/PRESIDENT MOORE EYE

Customer Signature and Date [signature] 12/20/2012

**Roles and Responsibilities of I-Plexus and Customer**

Performance Measures to be determined and worked through by both parties

Customer Role & Responsibility

1. Verify insurance coverage prior to delivery of care.
2. Obtain the necessary insurance authorizations for surgeries and procedures.
3. Gather and enter into billing system patient and insurance demographic information.
4. Complete coding of diagnosis and procedure codes.
5. Enter Patient Demographics.
6. Enter Patient Charges after one year from EMR go-live date if the charges are not generated through the electronic medical record (Dr. Ginsburg exception for two years).
7. Secure correct referral authorization number for any patient referral and deliver this number to I-Plexus.
8. Provision of terminals or PCs for remote access and use by I-Plexus Personnel.
9. Provide access to insurance cards and patient in-take sheets for review in the event that information entered by the customer staff is not sufficient to create a clean billing record.

I-Plexus Role and Responsibility:

1. Management and optimization of the Moore Eye revenue cycle, bringing it to best practice status.
2. Daily review and correction of all patient demographics, patient charges, patient point of service payments that are entered by customer's staff.
3. Reconciliation of daily and weekly billing logs against schedule to insure that all charge information has been gathered and sent to the I-Plexus billing office.
4. Daily entry of Patient Charges (for the first year after EMR go-live).
5. Daily entry of patient payments and insurance payments provided by Customer.
6. Daily claim submission to payers.
7. Daily correction of payer submission errors such as incorrect policy ID, non covered service, invalid CPT or ICD-9, etc.
8. Monthly patient statement generation to patients including the costs for print and postage.
9. Operation of call center to receive patient phone calls relating to billing inquiries. There is a toll free phone number place on patient statements that patients can call.
10. Follow up on unpaid payer balances.
11. Resolution of payer denials and/or partial pays.
12. Executive and Management reporting summarizing various aspects of charges, collections, write-offs relating to practice performance. To be mutually agreed upon.
13. Provide routine and ad-hoc provider level management reporting.
14. Dedicated personalized account manager to the liking of the Customer with the manager coming in person two times per year.
15. Ongoing credentialing for the providers.

16. Compliance with HIPAA and government regulations as they relate to the performance of billing operations on the behalf of the Customer within the terms of a Business Associate Agreement separately executed between the parties.
17. Pro-active education of the physicians and technicians pertaining to the coding of procedure codes, payer requirements, modifiers or any other critical items pertaining the accurate billing of procedures with various payer types.
18. Pro-active education specific to transition to ICD-10.
19. Employ two Customer FTEs for calendar year 2013. It is understood there will always remain 1 FTE on site paid by i-Plexus starting in 2014. The management of Moore Eye and i-Plexus have to mutually agree upon the successful candidate(s) qualifications.
20. Regular (mutually agreed frequency) auditing of the charts comparing what is charted versus what is coded. I-plexus will participate in the compliance plan and assist with prospective audits, potentially under an attorney provided by Moore.
21. Proactively validate chart documentation with charges as part of the daily charge entry process resulting in the validation of complete and appropriate coding.
22. I-Plexus certified coding staff will periodically audit and analyze charges against the documentation that is provided by MEI and recommend any coding or template changes accordingly.
23. Provide the necessary training for Moore's FTE(s) to be current on the latest CPT coding updates. The timing of said training will be determined by the availability of local and online classes. I-Plexus will review all new and modified templates and recommend any coding or template changes.
24. Provide Billing for Moore Eye Low Vision Specialists at no charge.
25. Responsible for overseeing the obtaining of SPOC for J/Q-codes and advising practice if a patients insurance will pay for the J/Q codes. Answering patients questions after technicians have obtained SPOC.
26. Performance indicators will be established and reevaluated on an annual basis. Please see Addendum A for performance thresholds. Performance indicators will be established prior to 30 days from contract acceptance.
27. Costs for the operation of Dr.com will be the responsibility of i-Plexus after March 4, 2013. The cost will not be incurred by i-Plexus if there is a MEI delay to the go-live of March 4, 2013.
28. Proactively monitor payment levels in comparison to the MEI fee schedules to ensure that fees are adequate and avoid underpayments due to pricing.
29. I-Plexus agrees to rent space for i-Plexus employee(s) at a price not exceeding 360/month for the duration of the agreement.
30. Please refer to Addendum B for additional contract terms and conditions.

Agreed and Accepted by:

I-Plexus Name and Title William Daghur - President

I-Plexus Signature and Date [signature] 12-20-2012

Customer Name and Title Leonard Ginsburg CEO/PRESIDENT MOORE EYE

Customer Signature and Date [signature] 12/20/12